**STATE of Missouri, Plaintiff–Respondent,**

v.

**John R. CAROLLO, Defendant–Appellant.**

**No. 26365.**

Missouri Court of Appeals, Southern District, Division Two.

Aug. 30, 2005.

Motion for Rehearing and Transfer Denied Sept. 21, 2005.

Application for Transfer Denied Nov. 1, 2005.

Kent Denzel, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Ronald S. Ribaudo, Jefferson City, for Respondent.

KENNETH W. SHRUM, Presiding Judge.

A jury convicted John Carollo ("Defendant") of second degree murder (§ 565.021) and armed criminal action (§ 571.015).[1] He was sentenced to concurrent terms of life in prison for the murder conviction and twenty years' imprisonment for the armed criminal action charge. In his only point on appeal, Defendant alleges the trial court erred when it overruled his motion to suppress and admitted into evidence over his objection a statement he made to the police. We affirm.

## STANDARD OF REVIEW

"At a suppression hearing, the State bears both the burden of producing evidence and the risk of nonpersuasion to show by a preponderance of the evidence that the motion to suppress should be overruled." *State v. Bradshaw*, 99 S.W.3d 73, 76[2] (Mo.App.2003). In reviewing a trial court's ruling on a motion to suppress, the appellate court considers the record made at the suppression hearing as well as the trial testimony. *State v. Haldiman*, 106 S.W.3d 529, 533[4] (Mo.App.2003).

Appellate review is limited to a determination of whether substantial evidence exists to support the trial court's ruling. *State v. West*, 58 S.W.3d 563, 567[1] (Mo.App.2001). "All facts and reasonable inferences therefrom are to be reviewed in the light most favorable to the order." *State v. Shifkowski*, 57 S.W.3d 309, 316[11] (Mo.App.2001). The trial court's decision will be reversed only if it is clearly erroneous, leaving this court with a definite and firm impression that a mistake has been made. *Haldiman*, 106 S.W.3d at 533[2].

---

1. All statutory references are to RSMo (2000), unless otherwise indicated.

## FACTS

On the morning of May 5, 2001, Defendant and Walter Champion walked into a liquor store in Springfield, Missouri, to buy some beer. Being transient or homeless, the pair typically "hung out" near the store. Another frequent patron of the store was Gilbert Warnick ("Victim"). On that day, all three congregated around the store.

In his videotaped statement to the police, Defendant claimed that Champion and Victim began arguing (as they often did) which escalated to a physical altercation. Defendant tried to break up the fight by separating the combatants. At that point, Victim attempted to attack Defendant and strike him with a rock. To protect himself, Defendant claimed that he first struck Victim with a rock. As Victim was on the ground, Defendant picked up a larger rock and slammed it down on Victim's head. Defendant then hitchhiked from the area, but Champion remained in the vicinity.

The second rock Defendant used against Victim was actually a piece of concrete weighing 25 to 30 pounds. At 5:45 P.M., Champion went to the liquor store to get help in contacting the police. The evidence indicated that Champion had waited a period of time before reporting the murder.

The condition of Victim's body was described as being "massively beaten." The doctor who performed the autopsy opined that Victim suffered a minimum of "eight blows." The fatal injury was described as follows: Victim's head was lying flat on the ground and a large amount of force was exerted on the left side of his head causing a blowout to the back of the skull. This was consistent with a large piece of concrete "being dropped down or thrown down" on Victim's head from the left side. The force that caused the damage was so great that it is "most frequently seen in car wrecks, and ... falls from great heights."

Almost one year later, Defendant was arrested in Denver, Colorado, for Victim's murder. Detective Allen Neal traveled to Denver to interrogate Defendant in conjunction with the murder investigation. Once there, Detective Neal interrogated Defendant twice. Prior to the first interrogation, Neal read Defendant his *Miranda* rights which he voluntarily waived. Defendant denied killing Victim in this first interrogation, which lasted approximately one hour and twenty minutes, ending at 10:30 A.M.

Then, Defendant agreed to take a polygraph examination. Prior to this test, Defendant was asked to sign a waiver of rights form provided by the Denver police. Defendant argues that this form failed to inform him that he had a right to counsel before making a statement, a right to counsel during questioning, and a right to stop the interrogation at any time to talk to an attorney.[2] After the polygraph, Defendant requested to speak with Neal again because he "wanted to tell [Neal] the truth about what happened."

Prior to the second interview, Neal told Defendant that he still had the "same rights" as he had prior to the polygraph test. During this second interrogation, Defendant related that he struck Victim twice with rocks or concrete. This forty-five minute interrogation ended at approximately 1:00 P.M. Defendant was transported back to Missouri to stand trial for Victim's murder.

At his criminal trial, Defendant employed two strategies: (1) he acted in self-

---

**2.** These three rights, however, were explained to Defendant prior to the first interview and were contained in the waiver form he signed at that time.

defense and (2) that Champion repeatedly struck Victim, causing his death, after Defendant left the scene. The first was based on Defendant's second statement to Neal indicating that Victim attacked him first and was going to attack again even after Defendant hit him once with a rock. The second strategy was based, in part, on the medical evidence indicating that Victim was hit multiple times (at least eight). From Defendant's statement to Neal, i.e., he only hit Victim twice, the defense asked the jury to infer that Champion delivered the other blows and caused Victim's death.

Defendant did not testify in his own behalf, and when questioned by the court about his decision, Defendant stated, "I think they've [the jury] heard my side of the story through the video [statement to Neal]." The jury rejected Defendant's "story" and convicted him of second-degree murder and armed criminal action. This appeal followed.

## DISCUSSION AND DECISION

In his sole point on appeal, Defendant alleges the trial court committed reversible error when it overruled his motion to suppress and admitted into evidence over his objection the statements he made to Neal during the second interrogation. He claims that this evidentiary ruling violated his state and federal constitutional rights against self-incrimination because Defendant "was not properly advised of his [Miranda] rights before making the statements."

To further explain, Defendant makes no argument that Neal did not comply with the requirements of Miranda before the first interrogation. He argues that Neal failed to comply with Miranda before the second interview because he told Defendant that he (Defendant) had only the "same rights" that were explained to him prior to the polygraph test. These rights

were contained on a form that, Defendant claims, did not include a warning that he had a right to counsel before making a statement, a right to counsel during questioning, and a right to stop the interrogation at any time to talk to an attorney. As such, Defendant argues that the statements must be suppressed for the failure to comply with Miranda.

■ The first reason Defendant's argument must fail is that the statements were admissible. Defendant admits that Neal fully complied with the dictates of Miranda prior to the first interview. Because of this, Neal was not required to re-Mirandize Defendant before speaking with him. It is has been repeatedly held that Miranda warnings need not be given each time an accused is questioned or simply because there is a time delay between the interrogation and when the warnings were read. State v. Rodriguez, 877 S.W.2d 106, 110–111[13] (Mo.banc 1994); State v. Bailey, 714 S.W.2d 590, 593[4] (Mo.App.1986); State v. Woodward, 587 S.W.2d 287, 289[3] (Mo.App.1979).

The first interrogation began at approximately 9:00 A.M., immediately after Neal read Defendant his full Miranda rights; the second interrogation began at approximately 12:15 P.M. The three-hour plus time lapse did not require Neal to read Defendant his rights again. Neal could have begun questioning Defendant anew without saying anything about his Miranda rights. Consequently, Neal did more than the law required, i.e., ensuring Defendant still understood his rights and reviewing the Denver form, thus protecting Defendant's rights to a greater extent. For these reasons, the statements were admissible.

Defendant's real argument is that Neal told Defendant that he had only the rights contained in the Denver police waiver

form. Essentially, Defendant argues that Neal implied that the rights explained to him before the first interrogation no longer applied, and the only rights Defendant enjoyed were those read to him before the polygraph test. When Neal returned for the second interview, he explained to Defendant that he still had the "same rights" as he had in the polygraph room. He never told Defendant that he had *only* these rights to the exclusion of any others explained to him before the polygraph test. Defendant was an educated man (2 years of college), and it is unreasonable to infer that he would believe that the only rights he had were those contained in the Denver form. We find nothing in the record to indicate Neal conveyed this message. We find Defendant's characterization of the record to be without merit.

Defendant's point also fails because of the reasonable trial strategy he employed. Before trial, he was essentially faced with two choices. He could seek to suppress the statements, and if successful, the State would arguably be left with little evidence to prosecute. Even if unsuccessful in this pursuit, he could properly object and take his chances on appeal if he truly believed the statements to be inadmissible. *See, e.g., State v. McCullum,* 63 S.W.3d 242, 259–60 (Mo.App.2001).

■ His second option, however, was the one he chose. That option was to face the statements directly and craft a defense around them. From the opening statement, the defense acknowledged the statements and their truth, attempting to use them to its advantage. The statements provided Defendant with a self-defense claim (Victim was the attacker) and an argument that Champion committed the fatal blows, i.e., Defendant only struck the severely beaten Victim twice. Simply stated, Defendant cannot seek to utilize evidence in the pursuit of reasonable trial strategy, and then, turn around on appeal and claim that same evidence was inadmissible and prejudicial. *See, e.g., State v. Collins,* 163 S.W.3d 614 (Mo.App.2005), and cases cited therein. Point denied.

The judgment of convictions and sentences is affirmed.

BARNEY, J., and BATES, C.J., concur.