

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | |
|---|---|
| MICHAEL J. NOLTE and BARBIE NOLTE,<br><br>Appellants,<br><br>v.<br><br>FORD MOTOR COMPANY,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

WD75371

OPINION FILED:
December 9, 2014

**Appeal from the Circuit Court of Jackson County, Missouri
The Honorable J. Dale Youngs, Judge**

**Before Division One:** Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer and Karen King Mitchell, Judges

Michael and Barbie Nolte (collectively "Nolte") appeal the trial court's judgment, entered following a jury verdict in favor of Ford Motor Company, on their product liability claims related to the placement and design of the fuel storage system in Ford's 2003 Crown Victoria Police Interceptor.[1] Nolte argues that the trial court erred in the admission and exclusion of certain evidence during trial. Because the trial court erroneously concluded that a government

---

[1] Barbie Nolte's only claim was loss of consortium. None of the points on appeal relate to this claim.

report is admissible without first determining that the report was both logically and legally relevant, we reverse and remand.

## Factual Background[2]

While patrolling Interstate 70 on the morning of May 22, 2003, State Trooper Michael Newton stopped eastbound driver Michael Nolte for a minor traffic violation. Both vehicles pulled onto the shoulder of the highway, and Trooper Newton asked Nolte to accompany him to the patrol car, a 2003 Ford Crown Victoria Police Interceptor (CVPI), so that Newton could issue a warning for the traffic violation. While both men sat in the patrol car, Paul Daniel, the driver of a Trade Winds pick-up truck, pulling a goose-neck trailer, was traveling eastbound on I-70. As Daniel neared the patrol car, he veered onto the shoulder of the interstate and collided with Trooper Newton's vehicle. Upon impact, the patrol car burst into flames, killing Trooper Newton. Nolte survived but sustained very serious burns as a result of the explosion. Because neither man broke any bones in the collision, the evidence indicated that the injuries probably would not have been as serious if the fire had not occurred.

Investigation of the fire revealed that it began in the left rear fender of the CVPI, at the area where the fuel filler neck extended between the fuel fill door and the fuel tank. When the truck crashed into the CVPI, the fuel filler neck was severed, allowing gasoline vapor to escape, which was then ignited by the friction sparks created from the impact.

Plaintiffs Michael Nolte, his wife Barbie Nolte, and Shonnie Newton, the widow of Trooper Newton, brought an action against Ford Motor Company, the manufacturer of the patrol car, and Trade Winds Distributing, Inc., Daniel's employer. The claim against Trade Winds was premised upon Daniel's negligence. Plaintiffs asserted both negligence and strict products

---

[2] Many of the facts are taken, without further attribution, from the Missouri Supreme Court's opinion in *Newton v. Ford Motor Company*, 282 S.W.3d 825 (Mo. banc 2009), an appeal following the first trial in this case wherein substantially the same evidence was introduced.

liability claims against Ford on the basis that the design of the anti-spill valve, the placement of the fuel tank filler tube on the driver's side of the patrol car, and the placement of the fuel tank behind the rear axle of the patrol car were defects that rendered the patrol car unreasonably dangerous when put to its anticipated use.[3]

Plaintiffs argued that these defects, alone or in combination, caused the explosion that killed Trooper Newton and injured Nolte and were unreasonably dangerous given the CVPI's anticipated use. The anti-spill valve consists of a spring and sealing flange and is designed pursuant to federal environmental regulations to prevent escape of vapors and liquid from the fuel tank. The anti-spill valve is located inside the fuel tank filler tube, the tube through which gasoline pumped at a filling station travels to the patrol car's fuel tank. Plaintiffs argued that, due to a defect, the anti-spill valve failed to prevent gasoline from escaping from the fuel tank when Trooper Newton's patrol car was struck by Daniel's truck and that, upon impact, gasoline spewed out of the patrol car's fuel tank filler tube and ignited, resulting in the fatal explosion. Plaintiffs also argued that the placement of the patrol car's fuel tank behind the car's rear axle was a defect because it placed the fuel tank within the patrol car's "crush zone," the area designed to absorb energy from a rear-impact collision and prevent harm to occupants of the vehicle. According to Plaintiffs, the fuel tank placement was defective in that the force of the collision caused the neck of the patrol car's fuel tank filler tube to tear from the fuel tank itself, resulting in a significant amount of gasoline leakage at the severance site. Plaintiffs contended that these design defects caused the explosion in this case, rendering the CVPI unreasonably

---

[3] Nolte ultimately abandoned the negligence claim against Ford.

3

dangerous for use by law enforcement to both stop motorists and serve as a blocker vehicle on high-speed roadways.[4]

The jury returned a verdict in favor of Plaintiffs on their claim against Trade Winds Distributing and awarded damages of $4 million to Newton and $4.5 million to the Noltes. On Plaintiffs' claim against Ford, the jury returned a verdict in favor of Ford, finding that Ford was not liable for the injuries sustained by Plaintiffs as a result of the collision.

Plaintiffs appealed, and the Missouri Supreme Court reversed and remanded the case for a new trial due to an error made by the trial court in precluding Plaintiffs from arguing reasonable inferences from evidence the trial court mistakenly believed had not been admitted. *Newton v. Ford Motor Co.*, 282 S.W.3d 825, 832 (Mo. banc 2009). Following remand, Trooper Newton's claims were settled, leaving only the Noltes as plaintiffs. Upon retrial, the jury again found in favor of Ford. The following facts are relevant to the second trial and Nolte's subsequent appeal.

**The Office of Defects Investigation (ODI) Report**

On November 27, 2001, the National Highway Traffic Safety Administration's (NHTSA) Office of Defects Investigation (ODI) opened a query,[5] based upon consumer complaints and Ford's issuance of a Technical Service Bulletin (TSB),[6] which recommended changes to certain

---

[4] In the trial forming the basis for the current appeal, Nolte also alleged manufacturing defects in some of the welds of the 2003 CVPI. None of those claims, however, are relevant to the current appeal.

[5] Once the ODI determines that a reported defect warrants further examination, it can either conduct a query or open an investigation. There are three types of queries: the recall query, the service query, and the equipment query. 2 Auto. Design Liability § 6:3 (3d ed.). These queries are designed "to inquire about recall scope, manufacturer technical service bulletins or field service actions . . . in which [a] manufacturer has identified [a] vehicle problem affecting [the] vehicle's safety, but which [the] automaker has attempted to handle internally." *Id*. There are also three levels of investigations. *Id*. The highest is the Formal Defect Investigation, which "includes [an] index of all documents therein . . . and [a] lengthy technical report when [the] case is closed or [an] initial defect determination is made." *Id*. The lower level investigations consist of: (1) a Preliminary Evaluation and, if found to be warranted, (2) an Engineering Analysis.

[6] A TSB is a recommendation from a vehicle manufacturer to vehicle owners that there is a potential issue with the vehicle. A TSB details a method of addressing the issue, but it differs from a recall in that the manufacturer does not take financial responsibility for the proposed corrective measures.

4

hex bolts and U-brackets on the CVPI for the purpose of reducing post-rear-collision fires.[7] The query was limited to model years 1992-2001 and to only Panther Platform vehicles (Crown Victoria, Grand Marquis, and Town Car). The report contained a variety of information gathered from inspections of post-crash subject vehicles, on-site and phone interviews with police personnel, and review of documents from Ford, General Motors, plaintiff attorneys, and NHTSA records.

The report provided a description of the Panther Platform fuel tank, identified the population of each model by year, described the TSB and Federal Motor Vehicle Safety Standard (FMVSS) 301 (involving integrity of the fuel system), outlined the various design changes to the vehicles over the years, compared the Panther Platform vehicles with General Motors's similar B-body style vehicles, discussed several fire reports associated with both Panther Platform and B-body vehicles, and identified the various fuel tank failure modes. The ODI report further discussed the "Florida Highway Patrol [ ] Rear End Collision Study of 1999,"[8] as well as anecdotal evidence from the California Highway Patrol.[9] The report also identified a variety of tests Ford had run to evaluate vehicle performance in high-energy crashes. The report contained statements from Ford and described Ford's CVPI Police Officer Safety Action Plan. The report issued the following findings:

---

[7] The hex bolts and U-brackets were located near the fuel tank and contributed to punctures of the fuel tank in rear-impact collisions. Ford installed shielding (shield upgrade) around these parts and strengthened the tank in an attempt to minimize the risk of punctures.

[8] The study was conducted by Florida's Bureau of Law Enforcement Support Services and involved model year 1992-1997 Ford Crown Victorias, model year 1991-1996 Chevrolet Caprices, model year 1985-1997 Ford Tauruses, and model year 1989-1997 Chevrolet Luminas, all of which were sold with a police package option. The report identified a significantly higher rate of fatal rear-impact crashes with fire for the Crown Victorias and Caprices (both with rear-of-axle fuel tanks) than for the Tauruses and Luminas (both with forward-of-axle fuel tanks). The ODI dismissed this distinction, however, as being the result of greater exposure for the rear-of-axle vehicles to high-speed rear-impact collisions due to law enforcement's preference for such vehicles on high-speed roadways.

[9] An unnamed contact at the California Highway Patrol, responding to an informal survey conducted by an unnamed employee of the ODI, indicated that the California Highway Patrol averaged one rear-impact collision per week, resulting in a CVPI being totaled. The unnamed contact could recall only two instances of fuel-tank failure in the past few years, with only one resulting in a fatality.

- The crash energy levels associated with post rear impact fuel tank failures in the CVPI vehicles are significantly greater than the levels in FMVSS 301 tests.

- Fuel tank failures during high-speed rear impacts can result from numerous causes in addition to the hex-headed bolt and U-brackets identified in the Ford TSB. Crash reports identify many causes for loss of fuel system integrity during a high-energy rear crash, such as puncture from a deformed frame rail, lower shock absorber supports, or stowed items in the trunk, hydrostatic rupture, and other causes.

- Based on an analysis of FARS[10] data, the risk of fire per fatal rear crash in the subject vehicles is comparable to that of the GM B-body vehicle (Caprice).

- The vast majority of reported post rear crash fires in the subject vehicles (over 80%) occurred in CVPI vehicles, even though they constitute less than 15% of the total Panther vehicle production.

- The Florida Highway Patrol Study did not identify a difference between the post rear impact fire risk in CVPI vehicles and that of the Caprice police vehicles.

- Ford-sponsored testing indicates that the subject vehicles are not unique in their inability to maintain fuel tank integrity in at least one example of a severe rear impact crash.

- There have been numerous high-energy rear crashes involving CVPI vehicles within the scope of Ford's TSB that exhibited little or no fuel loss and no fire.

After making these individual findings, the ODI summarized its findings, stating that:

> The available information regarding fuel tank failure mode, the risk of fire per fatal crash, field performance, and crash testing indicate that the performance of the subject vehicle in high-energy rear crashes is not unlike that of the most comparable peer vehicle, the GM B-body.

The ODI closed its query on October 3, 2002, giving the following reason:

> Under the present circumstance, it is unlikely that further investigation would produce sufficient evidence to demonstrate the existence of a safety-related defect in the subject vehicles. Therefore, the investigation is closed based on the

---

[10] FARS stands for Fatality Analysis Reporting System, which is a census of all fatal crashes occurring on public highways in the United States.

evidence available at this time. The agency reserves the right to take further action if warranted by new or changed circumstances.

During the query, the Center for Auto Safety submitted a petition to NHTSA, seeking to upgrade and expand the scope of the query to a full investigation, including an Engineering Analysis. NHTSA denied the petition, however, finding that, "[a]ccording to the analysis of FARS data, the subject vehicles are not over-represented with respect to the risk of fire following a high-energy crash in all impact directions as alleged in the petition." NHTSA specifically noted that, "[i]n fact, the data show that the *civilian population* of Panther vehicles has an overall lower risk of post-crash fires than AOS [all other sedans] *when all impact points are considered*." (Emphasis added.)

### Admission of the ODI

Before the second trial, Nolte filed a motion in limine, seeking to exclude "[a]ny evidence or testimony relating to the statistical analysis, the 'Findings' or the 'Reason for Closing' of NHTSA's Office of Defects Investigation Report SQ01-014, including any expert or lay opinions listed in this or any NHTSA reports." Nolte argued that the report, as a whole, was irrelevant to the issues in the case because its inquiry was limited and it failed to address the issues central to the case in that the report: (1) focused on whether the CVPI is substantially more dangerous than other cars with the fuel tank behind the rear axle; (2) primarily examined whether a recall was warranted based on one potential failure mode—hex-bolt and U-bracket tank punctures; and (3) did not inquire into whether the fuel containment system is reasonably safe when put to its intended use as a law enforcement vehicle. Nolte argued that the report was highly prejudicial in that the jury could mistakenly believe the investigation was a broader examination of the safety of the entire fuel containment system. Nolte's motion in limine also

sought to preclude argument from Ford that the ODI's decision to close the query was tantamount to a finding of no defect.

In the alternative to complete exclusion of the report, Nolte sought that it at least be redacted to remove references to the Florida Highway Patrol Study in 1999, statistical data findings from the Center for Auto Safety, FARS statistical comparisons, hearsay from the California Highway Patrol, ODI findings, and the ODI's proclaimed "reason for closing" the query.

The court held a pretrial hearing on Nolte's motion. At the hearing, Nolte argued that the ODI report should be excluded in its entirety or, in the alternative, that the ODI report should be redacted to remove any conclusions or opinions. Nolte specifically argued that admission of the ODI report "would lead to confusion and an inference [that] NHTSA closing the inquiry without opening up a full scale investigation and performing a full scale engineering analysis would be misleading and lead to juror confusion." Nolte pointed out that, in a prior case, Ford had entered a stipulation whereby all parties agreed not to offer any testimony or arguments "regarding the reason for closing or implying NHTSA found defect or any reference to any media stories." Nolte indicated that he would be willing to agree to a similar stipulation in this case.

Ford responded by arguing that "the so-called ODI" was received in its entirety in the first trial. Ford claimed that the ODI was "the subject of one of the appellate points on appeal to the Missouri Court of Appeals which affirmed [the trial court's] finding that the report was not only relevant but qualified as a public record under the Public Records Statute in Missouri citing *Rodriguez v. Suzuki.*"[11] Ford argued that "nothing has changed from an analytical standpoint to suggest your ruling here should be any different than the ruling made by every judge who has

---

[11] This Court's decision in *Newton v. Ford* was withdrawn when the Missouri Supreme Court took transfer of the case. The decision had, therefore, no precedential value, whatever it may have held. Consistent with these facts, the trial court advised the parties that it had not read, and would not be relying on, the appellate court decision.

8

looked at this question." Ford thus argued that the objections raised by Nolte "with regard to the conclusions in the report and the redaction of the conclusions were specifically rejected by" the Missouri Supreme Court's holding in *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47 (Mo. banc 1999). Ford argued that *Rodriguez* mandated admission of the ODI report in its entirety, claiming the *Rodriguez* "decision specifically held opinions and conclusions are admissible under the Public Records Statute, that the document comes in [in] its entirety." Ford further argued that the entire report was relevant because the ODI query involved "most if not all" of the same vehicles that Nolte was relying on to prove notice of defect to Ford, and that the report went directly to the issue of whether Ford demonstrated a conscious disregard, as alleged in Nolte's claim for punitive damages. Ford also argued that the report went directly to the issue of defect—specifically, whether these vehicles are unreasonably dangerous. Ford did not argue, however, that the ODI report was relevant because it went directly to the issue framed by Nolte's claims—whether the CVPI was unreasonably dangerous when put to its intended use by law enforcement to both stop vehicles and serve as a blocker vehicle on high-speed roadways.

The trial court took the matter under advisement, though the trial court did indicate that it had "a sense of what I feel like the answer is," noting that "the issues related to ***these kinds of documents*** are more in the nature of issues that people are going to have with regard to what argument is going to be made related to them." (Emphasis added.) The trial court indicated that it would "get [the parties] a ruling as quickly as I can." Though the record does not include this ruling, subsequent comments at trial indicate that the motion in limine was overruled based on a finding that the ODI report was admissible under *Rodriguez*. At trial, when Ford sought to cross-examine Nolte's expert, Jerry Wallingford ("Wallingford"), by showing him the ODI report, Nolte noted that he wanted "to renew [his] objection to the ODI and preserve it for the

9

record." The trial court acknowledged the preserved objection. Ford then proceeded to read from the report in detail as it cross-examined Wallingford. At one point, Nolte again objected when Ford referred to the portion of the ODI report addressing an "informal survey" of the California Highway Patrol. In the course of this discussion, Ford's counsel noted:

> Under the *Rodriguez* ruling this Court made the ruling. . . . The Court has already ruled under *Rodriguez*, the case is perfectly—it's quite clear that this is a document—the entire document is admissible. This is subject to cross-examination or weight, whatever he wants to give it. ***But the document is in evidence***. All I'm doing is reading the document.

(Emphasis added.) The trial court overruled Nolte's objection and noted in the process that "I have found and do continue to find that I'm compelled to hold that this is a *Rodriguez* document and is admissible. And its contents are likewise admissible." At a subsequent break in the proceedings, the parties took time to "move the admission of exhibits that have been discussed but not yet offered." In the course of this lengthy off-the-record discussion, Ford formally offered the ODI report. Nolte's counsel advised "[w]e stand on our previous record." The trial court responded: "Understood. All right, I will show [the ODI report] received over . . . [Nolte's] vigorous objection."

Nolte's case was submitted to the jury on a theory of strict liability due to design defects. Specifically, the jury was directed to determine that the location of the fuel tank rear of axle, or the location of the filler tube on the driver's side, or the filler tube check valve, or the design and manufacture of the welds in the left rear section of the vehicle in combination with the location of the filler tube and fuel tank, made the CVPI defective, and unreasonably dangerous when put to a reasonably anticipated use. The reasonably anticipated use argued by Nolte was a CVPI being stopped alongside a highway and used as a blocker vehicle. The jury returned a verdict in favor of Ford.

10

Nolte filed a motion for new trial, arguing error in the admission of evidence and testimony regarding the ODI report. Nolte argued that the report "suffer[ed] from gross hearsay violations," primarily evidence related to the California Highway Patrol. Nolte further argued that the report was irrelevant, as its purpose was to determine, not whether the CVPI was safe for the use at issue in the case, but whether it was significantly less safe than similar vehicles. In other words, Nolte claimed that the ODI report determined only whether the CVPI was on par with the current state of the art, a matter which was irrelevant in a strict products liability case premised on design defect, and that any probative value the report possessed was outweighed by its prejudicial effect. Nolte also argued that the court's reliance on *Rodriguez* for admission of the ODI report resulted in a deprivation of his constitutional right to a jury trial in that the jury's fact-finding role was eclipsed by the conclusions of the ODI. In response to questioning by the court, Nolte indicated that he did not recall previously raising the constitutional claim. The trial court overruled the motion.

## Analysis

Nolte raises four points on appeal related to the admission and exclusion of evidence. Because we find his first point dispositive, however, we do not address the remaining three.[12] In his first point on appeal, Nolte claims that the trial court erred in admitting both the ODI report and testimony about the report for several reasons: (1) the report contained untrustworthy hearsay; (2) the report was irrelevant to the issues in the case; and (3) the statute upon which the

---

[12] Nolte's second point claimed error in the exclusion of Nolte's evidence of other similar incidents resulting in fire. His third point claimed error in the exclusion of evidence regarding the effectiveness of a shield upgrade kit created by Ford to reduce the number of post-rear-collision fuel-fed fires in the CVPI. And his final point claimed error in the admission of Ford's other similar incidents not resulting in fire. Because we are not addressing these points, we have not addressed any of the facts relevant to those points in the factual background section of this opinion.

11

court relied when admitting the ODI report was unconstitutional, as applied in this case, in that it allowed the admission of a report that invaded the province of the jury.[13]

Because the trial court erroneously concluded that *Rodriguez* required admission of the ODI report without an evaluation of the logical and legal relevance of the report, in whole or in part, Nolte's first point on appeal is granted.

## A. Preservation and Waiver

In its brief, Ford claimed that Nolte failed to preserve his complaint that the ODI report lacked relevance and was therefore inadmissible. Ford alternatively argued that Nolte's claim had been waived by Nolte's references to the ODI report at trial before Ford's formal introduction of the report into evidence. At oral argument, however, Ford conceded that Nolte's relevance objection was preserved—a position plainly demonstrated by the record—and instead shifted its focus to the waiver argument.

Ford's waiver argument relies on the fact that Nolte first mentioned the report in his opening statement and then questioned Wallingford about the report during Nolte's case-in-chief. Ford concludes that these brief references constituted waiver of any subsequent challenge to the admission of the ODI report. We disagree.

When a party receives an adverse ruling on a motion in limine seeking to exclude evidence, he is faced with two options. The first is that he may simply object when the evidence

---

[13] Insofar as it was not raised until the motion for new trial, Nolte waived his as-applied constitutional challenge to section 490.220, which claimed that the statute allowed the admission of a report that invaded the province of the jury. "'[I]t is firmly established that a constitutional question must be presented at the earliest possible moment that good pleading and orderly procedure will admit under the circumstances of the given case, otherwise it will be waived.'" *Willits v. Peabody Coal Co., LLC*, 400 S.W.3d 442, 449 (Mo. App. E.D. 2013) (quoting *Meadowbrook Country Club v. Davis*, 384 S.W.2d 611, 612 (Mo. 1964)). Nolte's claim of hearsay appears to be barred by the holding in *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47 (Mo. banc 1999). We question, however, whether an unknown employee of the ODI, attributing comments during an "informal" survey to an unknown California Highway Patrol contact, is the sort of hearsay—or perhaps quadruple hearsay—that the Supreme Court intended to authenticate as comments of "great credibility." *Id.* at 58. Regardless, as we note in our ruling today, nothing about the precedent in *Rodriguez* eliminates the requirement that evidence be both logically and legally relevant to the issues of the lawsuit at hand.

is offered by the opposing party and "take his chances on appeal if he truly believe[s] the [evidence] to be inadmissible." *State v. Carollo*, 172 S.W.3d 872, 876 (Mo. App. S.D. 2005). Or he may "face the [evidence] directly" by first broaching the subject in an effort to reduce the potentially damaging effect of the evidence. *Id.*; *State v. Mickle*, 164 S.W.3d 33, 55-56 (Mo. App. W.D. 2005).

There is risk inherent in the second option, however, in that a party "cannot seek to utilize evidence in the pursuit of reasonable trial strategy[] and then[] turn around on appeal and claim that same evidence was inadmissible and prejudicial." *Carollo*, 172 S.W.3d at 876. "[I]t is clear that, with respect to a motion in limine, trial strategy or not, to properly preserve an objection to the admission of evidence, which is the subject of the motion, the movant must wait until the challenged evidence is actually offered and then make a specific objection to its admission." *Mickle*, 164 S.W.3d at 57. "[R]egardless of any trial strategy that may . . . [be] reasonably precipitated by that ruling, [a party's] pre-emptive introduction of *the challenged evidence* waive[s] his objection thereto on appeal." *Id.* (emphasis added).

This principle, however, is not implicated by references to challenged evidence that fall far short of "introducing" the challenged evidence. Our Supreme Court in *M.A.B. v. Nicely*, 909 S.W.2d 669, 672 (Mo. banc 1995), held that mere references to challenged evidence following strenuous (but unsuccessful) objections to its admission do not waive the right to challenge the admission of that evidence on appeal. When a party introduces evidence *related* to the challenged evidence, as opposed to the *actual* evidence being challenged, the courts have employed the "opening-the-door" doctrine to determine whether the prior objection to admission has been waived. *See id.*; *Guess v. Escobar*, 26 S.W.3d 235, 243 (Mo. App. W.D. 2000) (both discussing waiver in the context of opening the door). "'The doctrine of opening the door allows

13

a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination.'" *Barnett v. State*, 103 S.W.3d 765, 773 n.5 (Mo. banc 2003) (quoting *United States v. Durham*, 868 F.2d 1010, 1012 (8th Cir. 1989)).

Even if the door is opened, however, admission of otherwise inadmissible evidence is not an automatic consequence.

> Opening the door is one thing. But what comes through the door is another. Everything cannot come through the door. . . . The doctrine is to prevent prejudice and is not to be subverted into a rule for injection of prejudice. Introduction of otherwise inadmissible evidence under shield of this doctrine is permitted only to the extent necessary to remove any unfair prejudice which might otherwise have ensued from the original evidence.

*State v. Sapien*, 337 S.W.3d 72, 85 (Mo. App. W.D. 2011) (Ahuja, J., dissenting) (quoting *United States v. Winston*, 447 F.2d 1236, 1240 (D.C. Cir. 1971)); *see also Gamble v. Browning*, 379 S.W.3d 194, 204 (Mo. App. W.D. 2012) (noting that evidence offered on the theory that the other party opened the door must still be evaluated for legal relevance before admission).

Here, after his request for exclusion was overruled, Nolte advised the jury in his opening statement that he expected they would hear testimony about an inquiry conducted by NHTSA's Office of Defects Investigation. He indicated that the query was closed without opening a full engineering analysis—an action that Ford witnesses would agree did not equate to a finding of no defect. During Nolte's case-in-chief, Nolte questioned his expert, Jerry Wallingford, about the ODI report. Nolte asked Wallingford how the ODI report differed from a full-blown investigation, and he questioned Wallingford about the TSB prompting the query. Further, he discussed facts surrounding two specific crash tests submitted by Ford to the ODI during the query. But Nolte did not offer the ODI as evidence of these tests; instead he submitted Exhibits 309 and 310, which appear to have been records of the two crash tests discussed. Thus,

14

because Nolte did not admit the report himself, but did refer to it and offer some evidence contained within it, we must determine whether these actions opened the door for admission of the entire report. We do not believe that it did.

First, we note that Ford has made no argument that Nolte "made unfair prejudicial use" of the related evidence he did offer. Rather, the only use Nolte made of the substantive evidence he offered regarding the ODI report was to aid his objection to the exhibit. He attempted to discredit the exhibit and prevent the jury from relying on it during deliberations. This is not a situation where a party, seeking to take the sting out of damaging evidence, introduces the evidence so as to preclude an inference that the party was trying to hide it. Rather, Nolte's use of the report was simply to set the table—through generalized discussion of such reports—to aid his claim that it lacked relevance and the jury should not rely on it.

Even more compelling is the fact that one cannot open the door to evidence that has already been admitted. The record reflects that both parties treated the ODI report as effectively admitted into evidence after receiving the trial court's ruling rejecting Nolte's efforts to secure exclusion. In fact, when the ODI report was used by Ford to extensively cross-examine Wallingford, Ford countered Nolte's objection to the report by noting that the report was "in evidence." That both parties operated under this belief is solidified by the fact that the ODI report was not formally admitted into evidence until much later, as part of the parties' "off-the-record housekeeping," wherein they admitted numerous exhibits identified during the testimony.

We believe Nolte's references to the ODI report before its "formal" admission into evidence did not waive his earlier objections. It is plain that this was not a situation where the trial court had taken Nolte's motion in limine under advisement to be ruled based upon

developments at trial, but instead was a situation where the trial court simply felt compelled, as a matter of law, to admit the ODI report in its entirety in light of *Rodriguez*, and had so advised the parties.

Because "[a] party has a right to try the issues which have been forced upon him," *Arnold v. City of Maryville*, 85 S.W. 107, 108 (Mo. App. 1905), Nolte did not waive his strenuously asserted objections to admission of the ODI report due to its lack of relevance.

### B.  Standard of Review

We turn, therefore, to the merit of Nolte's claim of error.  "'The trial court is accorded considerable discretion in ruling on the admissibility of evidence, particularly where a subjective determination of relevancy must be made.'"  *Secrist v. Treadstone*, *LLC*, 356 S.W.3d 276, 280 (Mo. App. W.D. 2011) (quoting *Rock v. McHenry*, 115 S.W.3d 419, 420 (Mo. App. W.D. 2003)).  And reversal is warranted if a trial court has abused that discretion.  *Id*.  "However, in determining whether the trial court abused its discretion, it remains a question of law whether the trial court applied the correct legal standard in [ruling on the admissibility of] the evidence."  *Emerson v. Garvin Group, LLC*, 399 S.W.3d 42, 44 n.2 (Mo. App. E.D. 2013).  And "whether the trial court applied the correct legal standard is a question of law that we review de novo."  *Id*. at 44; *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.").

### C.  Admissibility of ODI reports as public records

Below, Ford claimed that the ODI report was admissible, in its entirety, pursuant to *Rodriguez*.  The trial court agreed, expressing the view that it was "compelled to hold that this is

16

a *Rodriguez* document and is admissible." *Rodriguez* construed and applied section 490.220,[14] Missouri's public records statute, in addressing the admissibility of an ODI report. 996 S.W.2d at 56. Section 490.220 provides:

> All records and exemplifications of office books, kept in any public office of the United States, or of a sister state, not appertaining to a court, shall be evidence in this state, if attested by the keeper of said record or books, and the seal of his office, if there be a seal.

*Rodriguez* was a products liability and negligence case against Suzuki Motor Corporation based upon an alleged defect in the Suzuki Samurai SUV that caused the vehicle to roll over in emergency driving situations due to a low center of gravity and excessively narrow track (also known as an insufficient static stability ratio). *Id*. at 54-55. At trial, Suzuki sought to admit, under section 490.220, various NHTSA reports[15] involving the denial of defect petitions based upon the Samurai's alleged rollover propensity, wherein NHTSA concluded that "the Samurai's 'static stability ratio'—the ratio of the half track width of the vehicle to center of gravity height—was well within the range for vehicles of its type, and further, that the Samurai's real-world performance on the nation's highways was comparable to that of most SUVs." *Id*. at 55. The reports "also concluded that '[r]ollovers . . . often appear to have been influenced by adverse driver and environmental factors such as high risk driving maneuvers, drinking, low ambient light, and lack of driver familiarity with either the vehicle or the road,'" and that the Consumers Union testing methodology—which was relied on by the plaintiff and indicated that "the Samurai had the lowest (worst) 'rollover safety margin' of any SUV tested"—was invalid. *Id*. The trial court excluded the reports. *Id*. at 51, 55.

Suzuki challenged the exclusion on appeal, and the plaintiff defended the trial court's action on the basis that the excluded reports contained inadmissible hearsay in the form of

---

[14] All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise noted.

[15] Suzuki also sought to admit reports of other governmental entities.

opinions and conclusions of NHTSA officials. *Id.* at 56. The Missouri Supreme Court first noted that the reports "clearly [met] the requirements of the section 490.220 exception" to the general rule barring hearsay insofar as they were published in the Federal Register, which is published under seal of the National Archives and Records Administration and contains records of the Office of the Federal Register, a public office of the United States. *Id.* The Court then addressed the question of "whether the statutory exception encompasses opinions and conclusions contained within the records," and determined that "the statute is unqualified and open-ended. Once the statutory foundational requirements are met, . . . then the reports are admissible in their entirety." *Id.* In response to the plaintiff's argument that "the admission of such 'unbridled rank hearsay' is a grave mistake," the Court indicated that "there should be little concern over conclusions contained in such reports because they are 'subject to the ultimate safeguard—the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions.'" *Id.* at 57 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988)).

In addressing whether Suzuki suffered any prejudice from the exclusion, the Court noted that "the reports *go to the heart of plaintiff's case*—the existence of a roll over design defect." *Id.* at 58 (emphasis added). The Court further noted that "the reports were generated by a government entity that is presumably independent and unbiased and whose ultimate function is to protect the public by seeking out product defects, if they exist," which "gave the reports great credibility." *Id.*

In addition to admissibility under section 490.220, the Court noted that the "[t]he original NHTSA report . . . w[as] independently admissible to refute the punitive damages claim, though the scope of that admissibility was limited to Suzuki's 'state of mind' in designing and marketing

18

the Samurai." *Id*. at 59. When offered for this purpose, the Court concluded that the reports did not constitute hearsay, but would have been subject to a limiting instruction, had the plaintiff sought one.[16] *Id.*

The plaintiff in *Rodriguez* did not argue that the reports at issue were not relevant, and the Supreme Court noted that "there is no question that the government reports are highly relevant." *Id.* at 55. This observation was no doubt a function of the fact that the ODI clearly addressed the precise defect and foreseeable use alleged by the plaintiff's strict liability claim, and thus the precise defect and foreseeable use the jury was required to consider in determining whether the Samurai was unreasonably dangerous. Important for our purposes, however, this observation plainly instructs that a government report that satisfies the foundation requirements of section 490.220 must nonetheless be relevant as a condition of its admissibility. Stated differently, though section 490.220 compels the admission of government reports without further demonstration of foundation and unfettered by substantive objections that could otherwise prevent admission, as with all evidence, the proponent of a government report must nonetheless establish the predicate condition that the report is both logically and legally relevant to a contested issue to be determined by the fact finder. *See Eltiste v. Ford Motor Co.*, 167 S.W.3d 742, 748 (Mo. App. E.D. 2005) (noting that the Missouri Supreme Court added no requirements

---

[16] In many federal cases, opponents to the admission of NHTSA reports offer a limiting instruction, advising the jury:

> that the result of the NHTSA investigation "is not binding on you. This lawsuit is an independent inquiry. You are hearing testimony that was not or may not have been presented to the government agency. In this lawsuit we are having a hearing in which attorneys for both sides can cross examine witnesses, which may help you in determining the truth in this case. The government agency did not hold such a hearing, under its procedures, and you may consider that in determining how much weight, if any, to give the findings and actions of the NHTSA. You may consider the extent of the NHTSA investigation, as recited in the report . . . and other testimony in this case, and you may give the report as much weight, if any, in your deliberations as you conclude should be given to it."

*Cohen v. Gen. Motors Corp.*, 534 F. Supp. 509, 512 n.3 (W.D. Mo. 1982).

for admissibility to those outlined in section 490.220, other than to note that all evidence must be relevant to be admissible).

### D. The trial court misapplied the law by failing to evaluate the relevance of the ODI report before deeming it admissible in its entirety.

Here, the trial court indicated that *Rodriguez*, and its interpretation of section 490.220, "compelled" the trial court to admit the ODI report in its entirety. In so doing, the trial court did not separately evaluate the relevance of the ODI report. This was error.

It is beyond dispute that "'[t]o be admissible, evidence must be [both] logically and legally relevant.'" *Westerman v. Shogren*, 392 S.W.3d 465, 474 (Mo. App. W.D. 2012) (quoting *Secrist*, 356 S.W.3d at 281). "Evidentiary relevance is directly related to the issue to be decided." *State ex rel. Humane Soc'y of Mo. v. Beetem*, 317 S.W.3d 669, 672-73 (Mo. App. W.D. 2010). "Evidence relevant in the context of a given issue or subject matter may not be relevant in another context." *Id*. "Logical relevance refers to the tendency of evidence 'to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Westerman*, 392 S.W.3d at 474 (quoting *Secrist*, 356 S.W.3d at 281). Logically relevant evidence includes evidence that "'supports a reasonable inference or presumption regarding the existence of a material fact.'" *Commonwealth v. Chmiel*, 30 A.3d 1111, 1157 (Pa. 2011) (quoting *Commonwealth v. Crews*, 640 A.2d 395, 402 (Pa. 1994)).[17] Though "facts bearing so remotely upon or which are so collateral to the issue that they afford only a conjectural inference should not be admitted in evidence." *People v. Dooley*, 944 P.2d 590, 597 (Colo. App. 1997).

"Legal relevance, on the other hand, 'is a determination of the balance between the probative and prejudicial effect of the evidence.'" *Westerman*, 392 S.W.3d at 474 (quoting

---

[17] "[W]hether the inferences . . . are reasonable [is a] question[] of law." *Porter v. Toys 'R' Us-Delaware, Inc.*, 152 S.W.3d 310, 316 (Mo. App. W.D. 2004).

*Secrist*, 356 S.W.3d at 281). "That balancing requires the trial court to 'weigh the probative value, or usefulness, of the evidence against its costs, specifically the dangers of unfair prejudice, confusion of the issues, undue delay, misleading the jury, waste of time, or needless presentation of cumulative evidence.'" *Id.* (quoting *Adkins v. Hontz*, 337 S.W.3d 711, 720 (Mo. App. W.D. 2011)). "If the cost outweighs the usefulness, the evidence is not legally relevant and should be excluded." *Id.*

The party seeking to admit evidence bears the burden of establishing both its logical and its legal relevance. *Secrist*, 356 S.W.3d at 283. This proposition holds true even when seeking to admit evidence under the limited foundational requirements of section 490.220. *State v. Allen*, 274 S.W.3d 514, 527-28 (Mo. App. W.D. 2008); *Eltiste*, 167 S.W.3d at 748. Furthermore, because governmental documents, such as the ODI report, are likely to be given significant credence by the jury, *see Rodriguez*, 996 S.W.2d at 58, it is all the more important that the proponent demonstrate not only logical but also legal relevance (*i.e.*, why the evidence will *not* be misleading or confusing for the fact finder).

Though Ford articulated various generalized arguments directed at logical relevance,[18] Ford never addressed the legal relevance of the report, despite the fact that Nolte consistently argued that the report was unduly prejudicial and that it would confuse and mislead the jury. Instead, Ford consistently urged that *Rodriguez* mandated admission of the ODI report in its entirety because it was a government report. The trial court accepted this argument. In so doing, the trial court failed to separately assess the logical and legal relevance of the report.

_____

[18] At trial, Ford made the following representations to the court in support of its claim that the ODI report was relevant:

> [I]t goes directly to the issue of punitive damages. It goes directly to the issue of Ford's knowledge. It goes directly to the issue of conscious disregard. It goes directly to the issue of defect. It goes directly to the issue of whether or not these vehicles are unreasonably dangerous.

21

The trial court's erroneous conclusion that it was compelled to admit the ODI report without first assessing the report's logical and legal relevance requires reversal only if the error resulted in prejudice. *Klotz v. St. Anthony's Med. Ctr.*, 311 S.W.3d 752, 763 (Mo. banc 2010) (holding that the improper admission or exclusion of evidence requires reversal only if the ruling results in prejudice). "Evidence is considered prejudicial if it 'tends to lead the jury to decide the case on some basis other than the established propositions in the case.'" *Ford v. Gordon*, 990 S.W.2d 83, 87 (Mo. App. W.D. 1999) (quoting *Graves v. Atchison-Holt Elec. Coop.*, 886 S.W.2d 1, 3 (Mo. App. W.D. 1994)). That standard is met in this case.

At a minimum, when evaluating whether the ODI report was logically relevant, the trial court needed to consider what facts were in issue, because evidence is logically relevant only "'if it . . . tends to prove or disprove a fact in issue.'" *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 185 (Mo. App. W.D. 2012) (quoting *State ex rel. Mo. Highways and Transp. Comm'n v. Greenwood*, 269 S.W.3d 449, 457 (Mo. App. W.D. 2008)).

In a design defect case, the jury is tasked with determining whether the product identified "was . . . in a defective condition unreasonably dangerous when put to a reasonably anticipated use" and whether "the plaintiff was damaged as a direct result of such defective condition as [it] existed when the product was sold." § 537.760(3)(b).

Thus, in the context of this case, the jury had to discern whether the CVPI was in a defective condition unreasonably dangerous when used by law enforcement for routine traffic stops and as a blocker vehicle on high-speed roadways because of the rear-of-axle tank location, the design of the anti-spill valve, or the location of the anti-spill valve.[19] For purposes of

---

[19] There is no dispute in this case that use of the CVPI by law enforcement for routine traffic stops and as a blocker vehicle on high-speed roadways was a reasonably anticipated use.

22

punitive damages, the jury had to determine whether Ford exhibited a conscious disregard for the safety of others.

The second question the trial court had to answer was whether the ODI report tended to either prove or disprove any of those facts in issue. It was Ford's burden, as the offering party, to demonstrate the answer to this question for the trial court, but Ford failed to meet this burden insofar as the report itself is ambiguous and Ford's assertions as to relevance were nothing more than mere conclusions. And because the trial court required no more clarity before deeming the document admissible, the question remains unanswered.

"'Where the relevancy or admissibility of evidence offered is not apparent[,] it may be rejected unless there is a statement of the purpose of its introduction by which the court may determine its relevancy or admissibility.'" *State v. Hamilton*, 310 S.W.2d 906, 908 (Mo. 1958) (quoting 20 C.J.S. Criminal Law § 1029, p. 404).

At this point, it is helpful to compare the facts of this case with those of *Rodriguez*. Although relevance was not an issue raised by the parties in *Rodriguez*, the Court nevertheless meticulously laid out the similarities between the questions addressed in the reports at issue and the issues raised by the parties in the case, which led to the Court's conclusion that the reports were "highly relevant."

In *Rodriguez*, "[t]he thrust of [the] plaintiff's case was to establish that the accident was caused by a design defect that gave the Samurai a high center of gravity, making it prone to roll over in emergency driving situations." *Rodriguez*, 996 S.W.2d at 54. The reports at issue expressly addressed the Samurai's center of gravity, whether rollovers tended to occur during ordinary emergency driving situations or under other circumstances, and whether the scientific studies relied upon by Rodriguez were reliable. *Id*. at 55. In other words, the reports expressly

addressed the issues in the case, and it was plain from the face of the document that the report tended to disprove a fact in issue: whether the Samurai was then in a defective condition. *Id*. at 58. Here, it is not apparent from the face of the report how its findings and conclusions relate to the alleged defect. It may be that the report is relevant, but it is simply not apparent from this record the way it was in *Rodriguez.*

And here, rather than explain to the trial court what the report meant, the parties repeatedly discussed what the report did *not* mean: they agreed that the closing of an ODI investigation was not tantamount to a finding of "no defect." But, apart from bare conclusions regarding relevance (or lack thereof), neither party identified what the report *did* mean.

We cannot plainly discern from our review of the ODI report that it tends to prove or disprove any of the facts in issue with respect to liability on Nolte's claim of strict liability. Unlike the ODI report in *Rodriguez*, which precisely addressed both the defect and the use asserted in the plaintiff's strict liability claim, this ODI report addresses multiple failure modes and uses (including civilian uses) and is not narrowly and precisely tied to the defects or specific use alleged by Nolte. Though not its focus, the report acknowledges the precise use alleged by Nolte and references data that highlight a heightened and disproportionate risk of injury or death when the CVPI is used for routine traffic stops and as a blocker vehicle on high-speed roadways. For example, the ODI report notes:

> While it is true that the police and civilian versions of the Crown Victoria share the same fuel system and rear suspension geometry, the CVPI vehicles have a much greater exposure to high-energy rear impacts due to the nature of their use as blocker vehicles at crash scenes or during routine traffic stops along high-speed public roads.

However, the report does not tie this fact to any particular failure mode, it discusses multiple possible failure modes, and it fails to address some of the failure modes raised by Nolte. In

24

short, though the report was apparently initiated in response to CVPI incidents to examine the problem that "[t]he fuel tank can rupture following a high-energy rear collision resulting in severe fires," the scope of the report meanders well beyond its genesis through a hodgepodge of data and material that does not appear to be directly related to the precise defects or use at issue in Nolte's case.

In deciding to close the inquiry without initiating a full investigation, the ODI notes a number of findings. The ODI found that the CVPI met Federal Motor Vehicle Safety Standard 301, pertaining to the performance of fuel containment systems post-collision. But, generally, meeting FMVSS standards (which sets an industry minimum) does not negate the possibility that a vehicle is unreasonably dangerous under a strict products liability theory. *See Johnson v. Hannibal Mower Corp.*, 679 S.W.2d 884, 885 (Mo. App. W.D. 1984) ("[C]ompliance with the minimum federal standards does not mitigate a manufacturer's responsibility under the theory of strict liability any more than does compliance with the state of the art unless such standards require the defective condition to exist." (internal quotations omitted)). The report compared data for the CVPI with data for a similar B-body model manufactured by GM and marketed to law enforcement, and found the risk of fire per fatal crash to be "comparable." This evidence did not tend to prove or disprove whether defects alleged in the CVPI existed rendering the CVPI unreasonably dangerous for law enforcement use on high-speed roadways. *See id*. The report also examined all impact locations involving all sedans (regardless of whether they were police vehicles). That the Crown Victoria performed comparably to all other sedans, in terms of risk of fire when hit from any direction, may have been relevant to the ODI in determining whether to continue its defect inquiry, but its relevance to a strict products liability case involving the use of Crown Victorias for law enforcement purposes on high-speed roadways is not clear. The report

includes Ford's assessment based on high-energy crash testing that "[n]o vehicle or fuel system design can completely eliminate the risk of fuel leakage in extremely severe collisions." If the reasonable inference from this reference is that the ODI concluded that a vehicle cannot be designed to withstand high-speed rear impacts of the nature experienced by Nolte, the report may be logically relevant. But because the report does nothing more than note Ford's assessment to this effect, we cannot say that such an inference can be reasonably drawn.

The ODI report itself does not indicate how these findings and the resulting decision to close the inquiry relate to the issues presented in this case. Nor did Ford attempt to explain how the various findings included in the report related to the issues the jury had to decide. In short, if the report did not tend to prove or disprove a fact in issue, it was not logically relevant. And, unless the report was logically relevant, it was not admissible. Because this was an inquiry the trial court needed—but failed—to make, the record simply does not indicate that Ford met its burden of demonstrating that the ODI report was logically relevant.

Even if we were able to readily discern the logical relevance of the ODI report to the liability issues presented in this case, or even if the report is logically relevant for the limited purpose of contesting a basis to award punitive damages, we would be left with an unresolved concern regarding the legal relevance of the report. And if the report lacked legal relevance, reversal is warranted. *See, e.g., Moon v. Hy-Vee, Inc.*, 351 S.W.3d 279, 285 (Mo. App. W.D. 2011); *Ford*, 990 S.W.2d at 87 ("Even relevant evidence should be excluded when the prejudicial effect of the evidence exceeds the probative value."); *Stevinson v. Deffenbaugh Indus., Inc.*, 870 S.W.2d 851, 860 (Mo. App. W.D. 1993) (same).

At trial, Nolte repeatedly objected to the admission of the report on the ground that it was likely to mislead the jury, specifically on the issue of defect, because he believed that the ODI

26

appeared to, but did not actually, answer the same question posed to the jury in the design defect trial. In other words, the ODI report seemed to speak on the ultimate issue in the case: whether the CVPI was defectively designed. And the report appeared to reach a conclusion that no defect existed, given the fact that the service query was closed because:

> [I]t is unlikely that further investigation would produce sufficient evidence to demonstrate the existence of a safety-related defect in the subject vehicle.

The problem with this conclusion is that, as previously explained, the report was not narrowly tailored to (or did not address at all) the specific defects alleged by Nolte, was not limited in its assessment to the specific use alleged by Nolte, and was not limited in its assessment to high-energy rear collisions. The potential for prejudice to Nolte from admission of the ODI report was great, as it likely implied to the jury that a federal regulatory agency, seemingly— though not definitively—tasked with the same responsibility the jury faced, already decided the issue in Ford's favor. Any confusion created by this implication was not alleviated by the instructions directing the jury how to discern whether a design defect existed, because "[w]ithout a definition of [the applicable standard] supplied *in the context of the particular [evidence]*, the jury may not be able to know what the [report] means by the word '[defect],' although it may later find out what the court means by that term." *Lee v. Hartwig*, 848 S.W.2d 496, 499 (Mo. App. W.D. 1992).

Additionally, throughout the trial, Ford strategically encouraged this confusion by consistently painting the picture that the jurors were "not the first folks to hear **this** claim." (Emphasis added.) Ford indicated that NHTSA "looked into the basic fundamental question of whether there was some problem with the Crown Victoria . . . in terms of high speed rear impacts, in terms of rear crashes, in terms of the potential for fire. That's what they were looking at. . . . The question was: Is there a design problem here?" Ford then pointed out that

the NHTSA investigation was closed without remedial action and never reopened, clearly implying that NHTSA's answer to the design question was "no." In short, Ford encouraged the jurors to accept the ODI report as the federal government's expert opinion on the very question the jurors were tasked with answering: was the CVPI in a defective condition rendering it unreasonably dangerous when put to a reasonably anticipated use? That may have been appropriate had Ford met its burden by demonstrating that the ODI report evaluated only and each of the defects alleged by Nolte in the limited context of the use alleged by Nolte. But, as we have explained, this did not occur.

This great potential for prejudice made it all the more important for the trial court to conduct a careful analysis of the report's relevance before deeming it admissible in its entirety, for once the report was in evidence, Ford was entitled to argue its import to the jury. *See Eagle Star Group, Inc. v. Marcus*, 334 S.W.3d 548, 556 (Mo. App. W.D. 2010); *Newton*, 282 S.W.3d at 831 ("[D]enying counsel the opportunity to discuss evidence in the case during closing argument is presumed prejudicial.").

The trial court failed to separately assess relevance, erroneously believing, as Ford suggested, that it was compelled to admit the ODI report merely because it was a government report with a tangential connection to the case. This was prejudicial error, as there is a reasonable probability that the error affected the outcome of the trial. *Elliott*, 215 S.W.3d 88, 93 (Mo. banc 2007). Given the fact that Nolte objected to the report on the basis of a lack of relevance, Ford had to do more than offer mere speculation and conjecture in order to satisfy its burden of demonstrating the report's relevance. Admitting the report over Nolte's relevance objection without holding Ford to its burden of demonstrating both logical and legal relevance was error. Thus, reversal for a new trial is required. In remanding, we are not predisposing

28

either the trial court's assessment of the logical and legal relevance of the ODI report or the tools available to the trial court to control the admission of evidence that may have limited relevance.

    The trial court's judgment is reversed.  This matter is remanded for a new trial and for further proceedings consistent with this opinion.

 

_____

Karen King Mitchell, Judge

Cynthia L. Martin, Presiding Judge, and
Mark D. Pfeiffer, Judge, concur.