DOANE et al., Appellants,

v.

GIVAUDAN FLAVORS CORPORATION et al.; Citrus
and Allied Essences, Ltd., et al., Appellees.

[Cite as *Doane v. Givaudan Flavors Corp.*, 184 Ohio App.3d 26, 2009-Ohio-4989.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–080928.

Decided Sept. 25, 2009.

28

Robert E. Sweeney Co., L.P.A., Mark Wintering, and Sean S. Kelly; Humphrey, Farrington & McClain, P.C., Kenneth B. McClain, Steven E. Crick, and Andrew K. Smith; and Gregory Leyh, P.C., for appellants.

Brian D. Goldwasser, Vincent P. Antaki, Rick L. Weil, and Danny M. Newman, for appellee Citrus and Allied Essences, Ltd.

Ulmer & Berne, L.L.P., Jeffrey F. Peck, and Christopher J. Mulvaney; and Hinshaw & Culbertson, L.L.P., Daniel W. McGrath, and Joshua G. Vincent, for appellee Polarome International, Inc.

RALPH WINKLER, Judge.

{¶ 1} On January 17, 2007, plaintiffs-appellants Robin Doane and Joey Wallace filed this lawsuit against their former employer, Givaudan Flavors Corporation [1]

---

1. In 1990, Givaudan was known as Fries & Fries, Inc. Between 1992 and 1997, Fries & Fries was a partner in Tastemaker, which operated the flavoring plant. In 1997, Givaudan

("Givaudan"), three Givaudan employees, and defendants-appellees Citrus and Allied Essences, Ltd. ("Citrus") and Polarome International, Inc. ("Polarome"), alleging that exposure at work to diacetyl, a butter-flavoring chemical, had caused them to develop the lung disease bronchiolitis obliterans. Citrus and Polarome supplied diacetyl to Givaudan.

{¶ 2} Robin Doane worked for Givaudan in various positions from June 7, 1993, to May 23, 1997. In 1994, she was promoted to "compounder." As a compounder, Doane was required to measure ingredients and mix them together according to Givaudan's flavor recipes. Doane received some safety training, and she was required to attend safety meetings. Doane identified diacetyl, acetaldehyde, and mustard-seed gas as chemicals requiring the use of a respirator. Doane stated in her deposition that she did not always wear a respirator, but that she would wear it when she encountered strong odors or when she was working with large quantities of certain chemicals. She sometimes did not use a respirator when working with small amounts of diacetyl because it "did not bother" her too much.

{¶ 3} On November 21, 1995, Doane was mixing a batch of flavor that included the chemical acetaldehyde. She removed her respirator before attempting to cover the tank with plastic. Escaping fumes caused Doane to lose her breath and experience tightness in her chest. She continued to experience tightness in her chest and difficulty breathing. A pulmonary-function test on December 14, 1995, showed a drop in Doane's breathing function. The examining doctor told Doane that she had bronchiolitis obliterans caused by exposure to acetaldehyde. In January 1996, a second doctor confirmed the diagnosis of bronchiolitis obliterans caused by exposure to workplace chemicals. Givaudan placed Doane in an administrative position in another building. Doane discovered that in 1991, a woman working in Givaudan's "liquids department" had died from lung disease. The next woman who had taken that job had quit when she developed bronchiolitis obliterans. When Doane had taken the same job, Givaudan had not told her about the lung disease suffered by the two previous workers.

{¶ 4} Doane filed a workers' compensation claim for bronchiolitis obliterans caused by "work related exposure." Her claim was allowed on April 15, 1996. On October 21, 1997, Doane filed a claim for an additional award for violation of specific safety requirements. In that claim, Doane stated that her bronchiolitis obliterans was caused by exposure to chemicals at work including, but not limited to, acetaldehyde. On April 13, 1998, Doane settled her claim for an additional award and signed a release. On April 19, 2000, Doane also signed an agreed settlement of her workers' compensation claim that contained a release.

---

purchased Tastemaker, and its name was changed to Givaudan–Roure Flavors Corporation. In 2000, the company became Givaudan Flavors Corporation.

{¶ 5} Joey Wallace began working for Givaudan in June 1991. He received some safety training, attended safety meetings, and was provided with a respirator. Wallace had access to the Material Safety Data Sheets ("MSDS") for diacetyl. As a lead operator, Wallace was responsible for the safety of other workers on his shift, including ensuring that the workers wore their respirators. Wallace testified that once he had mixed the various ingredients for a butter flavor containing diacetyl in a vessel, he did not wear a respirator. In June 1992, Wallace developed "cold-like symptoms" that caused shortness of breath when climbing stairs. Wallace consulted a doctor in July 1992 and went on short-term disability in August 1992. Wallace never returned to work. In December 1992, Givaudan suggested that Wallace see a pulmonary specialist. In January 1993, Wallace's primary-care physician suspected that his breathing problems were work-related and referred him to an occupational pulmonologist. In February 1993, Wallace began receiving Social Security and long-term disability benefits. In August 1994, Wallace had a lung biopsy that confirmed a diagnosis of bronchiolitis obliterans as a result of workplace exposure. Wallace filed a workers' compensation claim on July 14, 1995, for bronchiolitis obliterans caused by workplace exposure to "powder, dust, fumes, liquids and some chemicals." Wallace stated that he had become aware of the work-related cause of his disability on May 18, 1995. At some point prior to 1997, Wallace had requested a copy of the MSDS for diacetyl from Givaudan. His workers' compensation claim was initially denied. Wallace appealed to the Hamilton County Court of Common Pleas, which ruled that he could participate in the workers' compensation fund. Wallace's further claims for permanent partial and permanent total disability were allowed in 1997 and 2000 respectively.

{¶ 6} In 1994, Givaudan had hired a doctor to investigate the lung disease occurring in its plant. There is some evidence that Givaudan may have wanted to remain "officially ignorant" of the cause. Givaudan formed a task force to determine whether reported respiratory illness among its employees was work-related and, if so, what particular ingredient had caused the illness. The investigators for the task force were not permitted to discuss bronchiolitis obliterans with the employees. Givaudan's employees were not told about the instances of lung disease.

{¶ 7} This case was consolidated with the case numbered A–0700446, a wrongful-death action involving another Givaudan employee. All defendants filed motions for summary judgment on statute-of-limitations grounds and various other grounds. The trial court granted the motions for summary judgment "as to the intentional tort claims." The court stated in its entry that it was granting summary judgment because Doane and Wallace "knew or should have known in the mid 1990s that they had been injured and that the workplace was dangerous."

The court went on to specifically state that it was not deciding whether Doane's release in the workers' compensation case barred her present claims. The court also stated that it was not deciding whether Doane and Wallace had set forth a prima facie case of intentional tort against Givaudan. The court further stated that "Doane's and Wallace's claims under Counts 1, 2, 3, 4, and 5 fail for the reasons cited in the defendants' motions." Counts one through four all related to Citrus and Polarome, the suppliers of diacetyl to Givaudan. Count one alleged strict liability for defective design, count two alleged strict liability for failure to warn, count three alleged negligence, and count four alleged fraudulent conceal-ment. Count five referred to all defendants and alleged civil conspiracy. The court's entry dismissed the complaint and stated that the judgment was a final determination on the merits in the case numbered A–0700452. The entry further stated, "[T]his judgment entry does not affect Case No. A–0700446."

{¶ 8} Doane and Wallace have appealed. Wallace does not challenge the trial court's entry of summary judgment in favor of Polarome. Givaudan and its employees have since settled with Doane and Wallace.

{¶ 9} The first assignment of error alleges that the trial court erred in granting the motions for summary judgment on statute-of-limitations grounds.

{¶ 10} The trial court may grant a motion for summary judgment only when the evidence shows that no genuine issue of material fact remains to be litigated, the moving party is entitled to judgment as a matter of law, and it appears, with the evidence construed most strongly in favor of the nonmoving party, that reasonable minds can come to but one conclusion, and that conclusion is adverse to that party.[2]

{¶ 11} The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.[3] Once the moving party has satisfied its burden, the nonmoving party has a reciprocal burden to set forth specific facts showing that there is a genuine issue for trial.[4] Any doubt must be resolved in favor of the nonmoving party.[5]

{¶ 12} The applicable statute of limitations is set forth in R.C. 2305.10, which provides for a two-year period "after the cause of action accrues" in which to bring suit. R.C. 2305.10(B)(1) provides that a cause of action for bodily injury

---

**2.** See Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

**3.** See *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264.

**4.** See id.

**5.** See *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 604 N.E.2d 138.

caused by "exposure to hazardous or toxic chemicals * * * accrues upon the date on which the plaintiff is informed by competent medical authority that the plaintiff has an injury that is related to the exposure, or upon the date on which by the exercise of reasonable diligence the plaintiff should have known that the plaintiff has an injury that is related to the exposure, whichever occurs first."

{¶ 13} Citrus and Polarome argue that the January 17, 2007 complaint was filed outside the limitations period because Doane and Wallace had been informed in the mid–1990s by competent medical authority that exposure to chemicals in the workplace had caused their bronchiolitis obliterans. Doane and Wallace counter that the discovery rule applied to toll the running of the limitations period because they could not have learned until 2006 that diacetyl was the specific chemical that had caused their injuries.

{¶ 14} Under the discovery rule, a cause of action does not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, that he or she was injured by the wrongful conduct of the defendant.[6] The discovery rule tolls the statute of limitations only until the plaintiff has an "indication" of the defendant's wrongful conduct.[7] The relevant standard for determining whether the discovery rule tolls the running of the statute of limitations is the plaintiff's knowledge of the legal injury or wrong committed by the defendant.[8] The discovery rule must be specifically tailored to the particular context to which it is applied.[9]

{¶ 15} We hold that the running of the statute of limitations on Doane's and Wallace's causes of action was not tolled because, as set forth under the second assignment of error, there was no evidence of any wrongful conduct on the part of Citrus or Polarome that would have operated to toll the statute.

{¶ 16} We hold that the trial court did not err in granting summary judgment in favor of Citrus and Polarome on statute-of-limitations grounds. The first assignment of error is overruled.

{¶ 17} The second assignment of error alleges that the trial court erred in granting summary judgment in favor of Citrus and Polarome on the merits of counts one through five.

---

6. See *Norgard v. Brush Wellman, Inc.*, 95 Ohio St.3d 165, 2002-Ohio-2007, 766 N.E.2d 977, citing *Collins v. Sotka* (1998), 81 Ohio St.3d 506, 692 N.E.2d 581, and *O'Stricker v. Jim Walter Corp.* (1983), 4 Ohio St.3d 84, 447 N.E.2d 727.

7. See id.

8. See *Meeker v. Am. Torque Rod of Ohio, Inc.* (1992), 79 Ohio App.3d 514, 607 N.E.2d 874.

9. See *Norgard* at ¶ 10, citing *Browning v. Burt* (1993), 66 Ohio St.3d 544, 613 N.E.2d 993.

{¶ 18} Under R.C. 2307.78(A), a supplier is liable for compensatory damages based upon a products-liability claim if the supplier was negligent and that negligence proximately caused an injury, or if the supplier's product did not conform to a representation made by the supplier and the failure to conform to that representation proximately caused an injury.[10]

{¶ 19} In addition, R.C. 2307.78(B)(7) provides that a supplier is subject to liability for compensatory damages based upon a products-liability claim as if it were the manufacturer of a product, if the manufacturer would be subject to liability and the supplier marketed the product under its own label or trade name. Citrus and Polarome argue that as suppliers, they cannot be held liable under R.C. 2307.78(B)(7). According to expert testimony, diacetyl is a naturally occurring chemical. Further, expert testimony established that diacetyl does not pose a threat below certain levels. The record shows that while Citrus and Polarome did not alter or adulterate the diacetyl in any way, they sometimes repackaged it into smaller containers and added their own warning labels and stickers. Construing the evidence most strongly in favor of Doane and Wallace, we hold that there are genuine issues of material fact as to whether Citrus and Polarome may be held liable as a manufacturer under R.C. 2307.78(B)(7).

{¶ 20} Counts one, two, and three allege strict liability for defective design, strict liability for failure to warn, and negligence. Counts four and five allege fraudulent concealment and civil conspiracy. The essence of all these claims is that Citrus and Polarome knew about the dangers of diacetyl and failed to provide adequate warnings and/or concealed the true nature of the hazards.

{¶ 21} Under R.C. 2307.76, a product is defective due to inadequate warning or instruction if the manufacturer knew or, in the exercise of reasonable care, should have known about a risk associated with the product that allegedly caused the harm for which the plaintiff seeks damages, and if the manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause the type of harm for which the plaintiff seeks compensation and in light of the likely seriousness of that harm.[11]

{¶ 22} The duty to warn and the standard for determining whether a warning is adequate are the same for both strict-liability and negligence claims.[12]

---

10. R.C. 2307.78(A)(1) and (2).

11. See *Sheets v. Karl W. Schmidt & Assoc., Inc.*, 1st Dist. No. C–020726, 2003-Ohio-3198, 2003 WL 21414790.

12. See *Lewis v. Clark Equip. Co.*, 1st Dist. No. C–020271, 2003-Ohio-1543; *Falkner v. Para–Chem*, 9th Dist. No. 21288, 2003-Ohio-3155, 2003 WL 21396693.

To prove liability, it must be shown that in the exercise of ordinary care, the manufacturer knew or should have known of the risk or hazard about which it failed to warn.[13] Further, it must be shown that the manufacturer failed to take the precautions that a reasonable person would have taken in presenting the product to the public.[14]

{¶ 23} In the MSDS provided by Citrus, diacetyl is described as "irritating to skin and eyes. Vapor is irritating to throat and lungs." Under "protection information," Citrus's MSDS provides, "Respiratory: Air purifying respirator; Ventilation: Mechanical; Eye: goggles; skin: rubber gloves." Polarome's MSDS for diacetyl states, "Liquid and vapor is irritating to the skin and eyes. Vapor is irritating to throat and lungs."

{¶ 24} The MSDS conveyed the general knowledge about the dangers of diacetyl at the time of Doane's and Wallace's exposure. It is undisputed that prior to 2001, there was no published scientific literature linking diacetyl to bronchiolitis obliterans. There is nothing in the record to indicate that either supplier knew or should have known that diacetyl caused bronchiolitis obliterans.

{¶ 25} Under the sophisticated-or-knowledgeable-purchaser doctrine, a manufacturer's duty to warn may be discharged by providing the information about the dangers of the product to a third person upon whom it can reasonably rely to communicate the warning to the ultimate users of the product.[15] The question is whether the manufacturer was reasonable in relying on an employer to convey the necessary information to its employees.[16] The reasonableness of the manufacturer's reliance on the employer to convey the warning involves a fact-specific evaluation.[17]

{¶ 26} The record shows that Givaudan's knowledge about the dangers of diacetyl was equal to or greater than the knowledge of Citrus and Polarome. Givaudan created a task force to investigate the cause of respiratory disease among its employees. The task force's mission was to discover whether the respiratory disease among the employees was work-related, and if so, which

---

13. See *Falkner v. Para–Chem*, citing *Crislip v. TCH Liquidating Co.* (1990), 52 Ohio St.3d 251, 556 N.E.2d 1177.

14. See id.; *Lewis v. Clark Equip. Co.*, 2003-Ohio-1543, 2003 WL 1571581.

15. See *Adams v. Union Carbide Corp.* (C.A.6, 1984), 737 F.2d 1453; *Roberts v. George V. Hamilton, Inc.* (June 30, 2000), 7th Dist. No. 99 JE 26, 2000 WL 875324; *Steinke v. Koch Fuels, Inc.* (1992), 78 Ohio App.3d 791, 605 N.E.2d 1341.

16. See *Roberts v. George V. Hamilton*, Inc.; *Steinke v. Koch Fuels*, Inc.

17. See id.

particular chemical was causing the problem. There was some evidence that Givaudan wanted to remain "officially ignorant" of the cause of the disease and that the members of the task force were not permitted to mention bronchiolitis obliterans to the employees.

{¶ 27} Givaudan regulated the safety requirements of its employees. Givaudan also had exclusive control over the diacetyl after delivery, even putting its own labels on the drums. Givaudan managed its safety and health programs through a staff of professionals in those areas. Doane and Wallace testified that while working at Givaudan, they received safety training that included instruction on the MSDS, attended safety meetings approximately once a month, had access to the MSDS, and were provided with respirators along with other safety gear. Both Doane and Wallace identified diacetyl as a chemical that required the use of a respirator. Doane testified that she sometimes did not use a respirator when working with small amounts of diacetyl because it "did not bother" her too much. Wallace testified that once he had mixed the various ingredients for a butter flavor containing diacetyl in a vessel, he did not wear a respirator. Neither Doane nor Wallace had read or had attempted to read the MSDS for diacetyl while working at Givaudan.

{¶ 28} Construing the evidence most strongly in favor of Doane and Wallace, we hold that there are no genuine issues of material fact as to whether Citrus and Polarome, in the exercise of ordinary care, knew or should have known that diacetyl could cause bronchiolitis obliterans. The known dangers of diacetyl were communicated to Givaudan through the MSDS. Givaudan was a sophisticated purchaser that had knowledge equal to or greater than that of Citrus and Polarome about the dangers of diacetyl. The evidence, construed most strongly in favor of Doane and Wallace, showed that Citrus and Polarome were reasonable in relying on Givaudan to convey any necessary warnings to its employees. We hold that the trial court was correct in granting summary judgment in favor of Citrus and Polarome on counts one, two, and three.

{¶ 29} Doane and Wallace argue that the trial court erred in granting summary judgment on count four, which alleged fraudulent concealment. An action for fraudulent concealment requires proof of (1) a misrepresentation or concealment of a fact when there is a duty to disclose, (2) that is material to the transaction, (3) made falsely, or with knowledge of or reckless disregard as to its falsity, (4) with the intent of misleading another into relying on it, (5) justifiable reliance on the misrepresentation or concealment, and (6) resulting injury proximately caused by the reliance.[18]

---

18. See *Burr v. Stark Cty. Bd. of Commrs.* (1986), 23 Ohio St.3d 69, 491 N.E.2d 1101; *Greene v. Whiteside*, 181 Ohio App.3d 253, 2009-Ohio-741, 908 N.E.2d 975.

{¶ 30} Doane and Wallace argue that Citrus and Polarome were in possession of "superior internal knowledge of diacetyl's hazards and affirmatively chose to withhold this information." The basis for this claim is that Citrus and Polarome belonged to a trade group and a flavoring industry "clearinghouse for scientific information" that stated in some literature that diacetyl was "harmful by inhalation" and "capable of systemic toxicity." Further, Doane and Wallace complain that Citrus and Polarome did not disclose early testing that indicated that diacetyl "caused toxicity" in certain animals.

{¶ 31} Doane and Wallace admit that they did not read the MSDS provided by Citrus and Polarome. In spite of that fact, Doane, Wallace, and Givaudan were clearly aware that diacetyl was harmful if inhaled and that safety equipment including a respirator was required when working with diacetyl. The record shows that at the time Doane and Wallace were exposed to diacetyl, Citrus and Polarome did not know, and therefore did not conceal, that diacetyl exposure could cause bronchiolitis obliterans. We hold that the trial court was correct in granting summary judgment on the claims for fraudulent concealment.

{¶ 32} Finally, Doane and Wallace argue that the trial court erred in granting summary judgment on their claims for civil conspiracy as alleged in count five. Civil conspiracy is defined as " 'a malicious combination of two or more persons to injure another person in person or property, in a way not competent for one alone, resulting in actual damage.' "[19] "A civil conspiracy claim requires an underlying tortious act that causes an injury. Thus, if there is no underlying tortious act, there is no actionable civil conspiracy claim."[20] We have held that the trial court correctly granted summary judgment in favor of Citrus and Polarome on counts one through four. Without an underlying tort, Doane and Wallace cannot establish a claim for civil conspiracy. In addition, there is no evidence in the record to support a claim that either Citrus or Polarome conspired with any other entity to harm Doane and Wallace. The trial court did not err in granting summary judgment in favor of Citrus and Polarome on count five. The second assignment of error is overruled.

{¶ 33} The trial court's entry of summary judgment in favor of Citrus and Polarome is affirmed.

Judgment affirmed.

CUNNINGHAM, P.J., and DINKELACKER, J., concur.

---

19. *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, quoting *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640.

20. *Gator Dev. Corp. v. VHH, Ltd.*, 1st Dist. No. C–080193, 2009-Ohio-1802, 2009 WL 1027584, ¶ 31, citing *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 700 N.E.2d 859.

38

RALPH WINKLER, J., retired, of the First Appellate District, sitting by assignment.