[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Linert v. Foutz,* Slip Opinion No. 2016-Ohio-8445.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-8445

LINERT ET AL., APPELLEES, *v.* FOUTZ; FORD MOTOR COMPANY, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Linert v. Foutz,* Slip Opinion No. 2016-Ohio-8445.]**

*R.C. 2307.76—Trial court properly refused to instruct jury on manufacturer's postmarket duty to warn consumer.*

(No. 2014-1940—Submitted January 5, 2016—Decided December 29, 2016.)

APPEAL from the Court of Appeals for Mahoning County,

No. 11 MA 00189, 2014-Ohio-4431.

_____

**O'CONNOR, C.J.**

{¶ 1} In this appeal, appellees, Ross and Brenda Linert, contend that appellant, Ford Motor Company, is responsible for the severe injuries Ross sustained in a motor-vehicle accident caused when an intoxicated driver, Adrien Foutz, struck Ross's 2005 Crown Victoria Police Interceptor ("CVPI") from behind, triggering a fuel-fed fire.

**{¶ 2}** We address the Linerts' claim that the trial court should have instructed the jury on R.C. 2307.76(A)(2), Ohio's statute governing manufacturers' postmarket duty to warn consumers of risks associated with a product that are not discovered until after the product has been sold.

**{¶ 3}** We hold that the trial court properly refused to provide an instruction on the postmarket duty to warn, and accordingly, we reverse the appellate court's judgment.

### RELEVANT BACKGROUND

*The accident giving rise to the Linerts' claims*

**{¶ 4}** On November 11, 2007, Ross Linert, a veteran police officer with the Austintown Township Police, was on patrol in a department-issued 2005 CVPI manufactured by Ford. Ross was traveling at approximately 35 miles per hour, the posted speed limit, when he was struck from behind by a car driven by Foutz. Foutz, whose blood-alcohol level was more than three times the legal limit in Ohio, was in a 4,000 pound Cadillac Deville traveling at speeds estimated at 90 to 110 miles per hour—three times the posted speed limit.

**{¶ 5}** Ross alleged that upon collision, the CVPI's fuel-sender unit[1] separated from the fuel tank, creating a hole in the fuel tank that released fuel and ignited, spreading fire from the rear of the vehicle into the passenger compartment. Ross was able to escape, but sustained severe, painful burns to nearly a third of his body, including his face, head, arms, and legs. He is now disabled.

*The Linerts' claims*

**{¶ 6}** Ross initially filed a claim for relief in negligence against only Foutz.[2] In an amended complaint, Ross and Brenda Linert subsequently added product-

---

[1] A fuel-sender unit, or fuel-delivery module, sends fuel from the fuel tank to the engine and indicates to the driver how much fuel is in the tank.

[2] Foutz asserted that Ford's flawed product caused Ross's severe injuries. The Linerts ultimately dismissed with prejudice their claims against Foust on the day trial began.

liability and malice claims against Ford to the negligence action against Foutz. The Linerts' failure-to-warn claim[3] asserts that if Ford had warned customers of risks associated with the placement of the vehicle's fuel tank and the lack of a fire-suppression system, Ross would have survived his accident with minor injuries. Ford counters that the trial court properly refused to instruct the jury on R.C. 2307.76(A)(2), Ohio's statute governing manufacturers' postmarket duty to warn consumers of risks associated with the product that are not discovered until after the product has been sold, because the statute does not require warnings on all known dangers.

***The Panther-platform design***

**{¶ 7}** Ford introduced the Panther-platform design in 1979 and used it for several large civilian and law-enforcement four-door sedan models, including the Mercury Grand Marquis, the Ford Crown Victoria, the Ford Crown Victoria Police Interceptor, and the Lincoln Town Car. *Jablonski v. Ford Motor Co.,* 2011 IL 110096, 955 N.E.2d 1138, ¶ 8. The design of these models presented a different fuel-tank configuration in which the tank was located aft of the axle, but between the two rear wheels, about 40 inches from the rear bumper and in front of the trunk. *Id.* at ¶ 9. By 1981, however, Ford began designing new passenger-car models with the fuel tank located forward of the axle. *Id.* A decade later, most new Ford models were being manufactured with fuel tanks forward of the axle. *Id.*

**{¶ 8}** There have been many claims of defects associated with Panther-platform vehicles in litigation around the country for many years. *See, e.g., Nolte*

---

[3] Crashworthiness claims, sometimes framed as "second collision" or "injury enhancement" claims, arise when a defect in a motor vehicle allegedly enhances or increases the injuries sustained by a driver or passenger in the vehicle. *See Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 24-27; *see also Lally v. Volkswagen Aktiengesellschaft*, 45 Mass.App.Ct. 317, 328-329, 698 N.E.2d 28, 38 (Mass.App.1998) (describing plaintiffs' burden of proof for injuries sustained in crashworthiness cases); *Larsen v. Gen. Motors Corp.*, 391 F.2d 495 (8th Cir.1968) (first reported case recognizing crashworthiness doctrine).

*v. Ford Motor Co*., 458 S.W.3d 368 (Mo.Ct.App.2014) (negligence and design-defect claims alleging improper placement of fuel tank in CVPI that was struck by motorist, causing a fire that killed a state trooper and severely injured another person, who were both occupants of a CVPI); *Annelli v. Ford Motor Co*., Conn.Super.Ct. No. 4001345, 2007 WL 3087959 (Oct.4, 2007) (certifying class of consumers alleging design defects in the placement of fuel tanks in CVPI and other Panther-platform vehicles); *In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litigation*, 259 F.Supp.2d 1366 (J.P.M.L.2003) (ordering that three cases brought by citizens against Ford for defective design and placement of the fuel tank in the CVPI be included in a multidistrict action in which municipalities were the original plaintiffs); *see also* Perry & McGroder, *Crash-and-Burn Cruisers that Kill*, Trial (Nov.2003) 52 (describing claims arising from fires in CVPIs). The Linerts' case presents a similar claim.

### *Evidence at trial*

**{¶ 9}** The Linerts' evidence at trial supported the theory that Ford's design of the CVPI was defective because of the placement of the fuel tank in the vehicle. To establish that claim, they presented the testimony of Mark Arndt, an engineer and defective-design expert who studies fuel-system failures in motor vehicles, including the CVPI, and postcrash fires in particular types of motor vehicles.

**{¶ 10}** Arndt testified that the preferred placement of a gas tank in a vehicle is forward of the axle in the "midship" location because there, the tank would be less likely to be crushed or punctured during a collision. And he testified that Ford could have placed the CVPI's gas tank forward of the axle.

**{¶ 11}** Arndt also opined that the CVPI's fuel tank was "extremely vulnerable" to punctures from items in the trunk of a police cruiser and testified that Ford had developed a "trunk pack" because of the number of "failures" in crashes in which items in police cruisers, e.g., jacks, crowbars, axes, and guns, had punctured the CVPI's trunk wall and then the fuel tank. The packs contained layers

of plastic and Kevlar, a tough material used in bulletproof vests, to prevent items in the trunk from penetrating the trunk wall. And he described the pack as promoting "loading the trunk in a way that did not align objects in the trunk so that they would go through the tank."

{¶ 12} But more relevant for purposes here is Arndt's testimony that there had been 34 other accidents in which a Panther-platform vehicle was involved in a rear-impact collision and sustained damage to its fuel-containment system, resulting in a fire and burn injury or death to a vehicle's occupant. Of those 34 prior incidents, Arndt indicated that six involved the dislodgement of the fuel-sender unit.

{¶ 13} Linert used this evidence to establish that Ford had had notice of the alleged defects with the design, placement, and manufacturing of the fuel system in the CVPI and that Ford could have used an alternative design for the placement of the fuel tank that "would have performed without leakage." Notably, however, Ford secured several concessions during its cross-examination of Arndt.

{¶ 14} Arndt conceded that there is a risk of postcollision fire for all vehicles, regardless of where the fuel tank is located, and that no fuel system is guaranteed to be leak-proof in a high-speed, rear-impact collision, no matter how "solid" the design of a fuel system or the placement of the fuel tank in the vehicle. Fuel-system ruptures, punctures, or compromises cannot be eliminated. He also admitted that the puncture of a fuel tank during an accident does not mean the vehicle is defective, conceding that the risk of a "rear-end postcollision fire for police vehicles is rare" and that fires in CVPIs caused by rear impact are the most severe impacts on the roadways.

{¶ 15} It was undisputed at trial that in October 2007, two years after the Austintown Police Department acquired Linert's CVPI, Ford the "crimp improvement project" or "crimp tooling project" to increase, by one millimeter, the

amount of sheet metal that was folded over the fuel-sender retention ring.[4] The project began after Jon Olson, a Ford design-analysis engineer, heard of "real-world" incidents regarding fuel-tank dislodgments and asked Ford's manufacturing manufacturing-process team, including Ford fuel-tank-manufacturing-process engineer Steven Haskell, if the crimp could be improved.

{¶ 16} Haskell and other Ford manufacturing-process engineers testified that the project began in January 2007 and that by October 2007, the crimp had been improved. At the same time, however, Haskell and other Ford witnesses made clear that Ford had met all its manufacturing specifications or standards for the fuel tank before and after the crimp-tooling project. They agreed, however, that the improvement made the fuel tank safer, more crashworthy, and more "robust." And although Haskell acknowledged that the improved crimp could make the fuel tank more crashworthy in some accidents, he never quantified or qualified that possibility. Indeed, earlier in his testimony, Haskell had made clear that he was not "a crash expert" and could not testify as to how the fuel tank would perform "in a crash scenario." Although Haskell opined that the crimps from the improvement project were a "little better," the actual change in strength was difficult to measure.

*The verdict and appeals*

{¶ 17} After a two-week trial, the trial court instructed the jury on the claims of defective design, defective manufacturing, and failure to warn. The instructions given on the failure-to-warn claim related only to whether Ford had failed to warn at the time of marketing the CVPI. The trial court refused to instruct the jury on the issue whether Ford had had a duty to give a postmarketing warning of a risk associated with the CVPI.

---

[4] In the CVPI, the fuel-sender unit is bolted to a retention ring that is crimped into place, with steel from the fuel tank, around a 118 millimeter (between four and five inches) hole in the upper front face of the fuel tank.

**{¶ 18}** The jury deliberated for approximately two hours before it returned a verdict in favor of Ford on all of the Linerts' claims, finding that they had failed to prove by a preponderance of the evidence that Ford had improperly designed the CVPI with regard to the placement of the fuel tank, defectively manufactured the CVPI fuel tank, or failed to adequately warn Ross of the risks associated with the CVPI. The trial court entered judgment in favor of Ford.

**{¶ 19}** The Linerts appealed, asserting 11 assignments of error. The appellate court rejected most of those claims but agreed with the Linerts' assertion that the trial court had erred by not instructing the jury on the Linerts' claim that Ford had had a duty to give consumers a postmarketing warning. In so doing, the appellate court focused on the Linerts' contentions that an instruction on the postmarketing duty to warn was necessary so that the jury would not ignore Ford's postsale knowledge of the risk of fire in the CVPI and that a reasonable manufacturer would have given a warning of that risk to consumers, including to the police community. 2014-Ohio-4431, 20 N.E.3d 1047, ¶ 23-24.

**{¶ 20}** The appellate court then made clear its view of the nexus between the duty to warn and the risk posed by the product:

> Just because the jury found the CVPI was not defective in manufacture does not mean that [the Linerts'] failure to warn claim must fail. A failure to warn claim involves failure to warn of a "risk," not a failure to warn of a "defect." The two terms are not the same. A "manufacturing defect" is "an imperfection in a product that departs from its intended design even though all possible care was exercised in its assembly and marketing." Black's Law Dictionary 174 (Pocket Ed. 1996). A "risk," however, is "a known danger to which a person assents, thus foreclosing recovery for injuries suffered." Black's Law Dictionary 554 (Pocket Ed. 1996).

> In a strict products liability case for failure to warn, "the failure to warn of unreasonable dangers associated with the product constitutes the defect." *Sapp v. Stoney Ridge Truck Tire,* 86 Ohio App.3d 85, 619 N.E.2d 1172 (6th Dist.1993). In this case then, Ford's failure to warn of a known risk associated with the CVPI's fuel tank could constitute a defect. Thus, a jury instruction on postmarketing failure to warn was warranted regardless of the jury's finding on [the Linerts'] manufacturing defect [claim].

*Id.* at ¶ 25.

{¶ 21} After then describing the evidence that the Linerts had presented about Ford's crimp-improvement project, the appellate court concluded that because the Linerts had presented evidence to the jury that Ford knew of some incidents of sender-unit dislodgements, had looked into those incidents, and had successfully increased the amount of crimping and created "a stronger, more robust union of the sender unit to the fuel tank and a more crashworthy vehicle," there was sufficient evidence to warrant a jury instruction on postmarketing failure-to-warn claim. *Id.* at ¶ 29.

{¶ 22} Notably, the appellate court also held that the trial court had erred in denying the Linerts the opportunity to present evidence that Ford had developed a fire-suppression system for the CVPI and had offered it to consumers after the sale of Ross's CVPI to the Austintown Police Department. As the appellate court explained in its opinion, the Linerts attempted to introduce the deposition testimony of Richard Cupka Jr., the former leader of the CVPI Technical Task Force. Cupka testified that Ford designed and put in place a fire-suppression system on CVPIs and that Ford had started to design that system before Ross's accident and it had become available after the accident. *Id.,* 2014-Ohio-4431, 20 N.E.3d 1047, at ¶ 85-86.

**{¶ 23}** The appellate court found that the Linerts wanted to introduce Cupka's testimony for two purposes: to establish that the 2005 CVPI was defectively designed because it did not include a fire-suppression system and to demonstrate that Ford knew of the risk of fire in the CVPIs. *Id.* at ¶ 86. Although the appellate court recognized that the trial court had excluded Cupka's testimony because the Linerts had not provided expert testimony to establish that if a fire-suppression system would have been in Ross's CVPI, it would have prevented the fire and his injuries, it held that the trial court erred in failing to consider that the Linerts also offered evidence of the fire-suppression system to meet their burden of establishing that Ford had notice of a potential fire risk in the CVPI. *Id.* at ¶ 89-92.

**{¶ 24}** The court of appeals proceeded to hold that the trial court had abused its discretion by excluding evidence of the fire-suppression system, *id.* at ¶ 92, and it ordered a new trial on the Linerts' postmarketing failure-to-warn claim. We accepted Ford's discretionary appeal from that judgment on two propositions of law:

> A "risk" that triggers a post-marketing duty to warn under Ohio Revised Code 2307.76 is not merely any "known danger," but must be a risk about which a reasonable manufacturer would warn in light of the likelihood and likely seriousness of harm.
>
> A product manufacturer's implementation of a post-marketing product improvement does not trigger a post-marketing duty to warn.

*See* 142 Ohio St.3d 1463, 2015-Ohio-1896, 30 N.E.3d 973.

## ANALYSIS

**{¶ 25}** Although our analysis is focused only on the postmarket duty to warn, in order to understand that duty, it is necessary to review the statutory scheme that gives rise to it.

{¶ 26} Unless the danger posed by a product is generally known and recognized by a consumer,[5] Ohio imposes on manufacturers two related duties to warn: a duty to warn of dangers known to the manufacturer at the time of sale of the product and a duty to warn of dangers that were not obvious at the time of sale but became known to the manufacturer after the product was sold to a consumer. These duties are codified in R.C. 2307.76:

> (A) Subject to division[ ] (B) * * * of this section, a product is defective due to inadequate warning or instruction if either of the following applies:
>
> (1) It is defective due to inadequate warning or instruction at the time of marketing if, when it left the control of its manufacturer, both of the following applied:
>
> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
>
> (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks

---

[5] "As a general rule, a manufacturer does not have a duty to warn consumers of dangers inherent in the use of the manufacturer's product if those dangers are generally known and recognized by the ordinary consumer." *Gawloski v. Miller Brewing Co.*, 96 Ohio App.3d 160, 163, 644 N.E.2d 731 (9th Dist.1994), citing 2 Restatement of the Law 2d, Torts, Section 402A, at 352-353, Comments i and j (1965)*; Sapp v. Stoney Ridge Truck Tire*, 86 Ohio App.3d 85, 98-99, 619 N.E.2d 1172 (1993). "In other words, a defendant's statutory duty to warn is obviated when the dangerous condition causing injury to the plaintiff is open and obvious or commonly known." *Lykins v. Fun Spot Trampolines*, 172 Ohio App.3d 226, 2007-Ohio-1800, 874 N.E.2d 811, ¶ 15.

to recover compensatory damages and in light of the likely seriousness of that harm.

(2) It is defective due to inadequate post-marketing warning or instruction if, at a relevant time after it left the control of its manufacturer, both of the following applied:

(a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;

(b) The manufacturer failed to provide the post-marketing warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant seeks to recover compensatory damages and in light of the likely seriousness of that harm.

(B) A product is not defective due to lack of warning or instruction or inadequate warning or instruction as a result of the failure of its manufacturer to warn or instruct about an open and obvious risk or a risk that is a matter of common knowledge.

R.C. 2307.76(A) and (B).

**{¶ 27}** To prove a "failure to warn" claim, a plaintiff must establish that a duty to warn against reasonably foreseeable risks exists, a breach of that duty occurred, and the plaintiff's injuries were proximately caused by the breach. *Miller v. ALZA Corp.*, 759 F.Supp.2d 929, 934 (S.D.Ohio 2010), citing *Graham v. Am. Cyanamid Co.,* 350 F.3d 496, 514 (6th Cir.2003).

**{¶ 28}** A manufacturer provides "inadequate warnings if it knew or reasonably should have known of the risk in the exercise of ordinary care and failed

to take precautions that a reasonable person would take in presenting the product to the public." *Welch Sand & Gravel, Inc. v. O & K Trojan, Inc.,* 107 Ohio App.3d 218, 226, 668 N.E.2d 529 (1st Dist.1995). But a manufacturer is not liable for failing to warn unless a plaintiff shows that the manufacturer failed to take the precautions that a reasonable person would take in presenting the product to the public. *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990), paragraph two of the syllabus. *See also Doane v. Givaudan Flavors Corp.*, 184 Ohio App.3d 26, 2009-Ohio-4989, 919 N.E.2d 290, ¶ 21 (1st Dist.).

{¶ 29} Although at least one of our appellate courts has suggested that the duty to warn at the time of marketing continues after the product is sold, *Zager v. Johnson Controls, Inc.*, 2014-Ohio-3998, 18 N.E.3d 533, ¶ 36 (12th Dist.), we clarify that a claim for failing to warn after the product is sold is separate from a claim that a warning should have been given at the point of sale.

{¶ 30} Undoubtedly, the two warnings are related. But properly understood, they represent two conceptually distinct warnings.

{¶ 31} "A post-sale warning could not be given at the point of sale because a manufacturer would not have knowledge to give it." *Patton v. Hutchinson Wil-Rich Mfg. Co.,* 253 Kan. 741, 754-755, 861 P.2d 1299 (1993). *See also Cover v. Cohen*, 61 N.Y.2d 261, 275, 473 N.Y.S.2d 378, 461 N.E.2d 864 (1984) ("Although a product [can] be reasonably safe when manufactured and sold and involve no then known risks of which warning need be given, risks thereafter revealed by user operation and brought to the attention of the manufacturer or vendor may impose upon one or both a duty to warn"). The postmarket duty to warn recognizes that "[e]ven when a product is not defective at the time of sale, a manufacturer may be subject to liability if it subsequently learns of dangers attendant to the use of the product or methods to avoid serious risks and fails reasonably to communicate that information to product users." Henderson & Twerski, *The Products Liability Restatement in the Courts: An Initial Assessment*, 27 Wm.Mitchell L.Rev. 7, 28

(2000). "Accordingly, courts apply the traditional failure to warn claim when a manufacturer or seller had knowledge of a defect at the time of sale and apply the postsale failure to warn claim when a manufacturer or seller learns of the defect after the time of sale." *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 542 (Tenn.2008), citing Schwartz, *The Post–Sale Duty to Warn: Two Unfortunate Forks in the Road to a Reasonable Doctrine,* 58 N.Y.U. L.Rev. 892, 893 (1983).

{¶ 32} In a postmarket duty to warn, the fact-finder's focus must be on any evidence of a risk associated with the product of which the manufacturer acquires knowledge *after* the sale of the product. Thus, the appellate court improperly relied on the evidence of Ford's fire-suppression kit and the trunk pack in finding that the jury should have been instructed on a postmarket duty to warn. Although the fire-suppression kit for CVPIs that Ford designed was offered to law-enforcement consumers after the sale, the risk of fire from fuel-containment systems, including fuel-sender units, was well known to Ford *prior* to the sale. That evidence was relevant to the Linerts' claim for failure to warn at the time of sale—a claim that the jury rejected—but it is not relevant to a postmarket duty to warn under R.C. 2307.76(A)(2).

{¶ 33} The Linerts' claim fails for a second reason.

{¶ 34} A determination whether a manufacturer acted reasonably in failing to give a warning to consumers after a product has been sold must include consideration of the likelihood of the risk of harm to consumers and the seriousness of the harm that the risk presents. *Brown v. McDonald's Corp.*, 101 Ohio App.3d 294, 300, 655 N.E.2d 440 (9th Dist.1995). For purposes here, we accept that the seriousness of the harm was established at trial. But the likelihood of that risk certainly was not.

{¶ 35} The Linerts' burden was to establish that Ford had gained knowledge of the likelihood of a risk of harm after the sale of the CVPI to the Austintown

Police Department that warranted Ford's giving a warning to the Austintown Police Department and other consumers. There was a paucity of such evidence.[6]

{¶ 36} Even in briefing and argument before this court, counsel for the Linerts failed to clearly articulate the facts and evidence that would give rise to such a duty. At best, we are presented with the contention, in the Linerts' merit brief, that there were six incidents in which Panther-platform vehicles caught fire as a result of a fuel-sender-unit failure, and the Linerts' counsel's more specific suggestion at oral argument that all six incidents involved CVPIs.[7] But even if we accept the suggestion that all six incidents involved CVPIs that caught fire as a result of sender-unit failures caused by rear-end collisions, that evidence is devoid of a sufficient context from which a jury could determine whether Ford acted unreasonably by failing to warn consumers of the risk of fire from sender-unit failures in CVPIs, because we do not know the circumstances that gave rise to the sender-unit failure in the six cases on which the Linerts rely.

{¶ 37} More importantly, the Linerts have not sufficiently addressed the likelihood element of R.C. 2307.76(A)(2), by placing those six incidents in context of the number of CVPIs that were in use at the time. For example, the jury had

---

[6] Whether the risk of harm is sufficiently great to justify the burden of providing a warning is an essential aspect of proving a postmarket-failure-to-warn case. *See Lovick v. Wil-Rich*, 588 N.W.2d 688, 694 (Iowa 1999), citing Restatement of the Law 3d, Torts, Products Liability, Section 10 (1997). We recognize that other courts have held that evidence of the reasonableness of giving a postsale duty to warn, or failing to do so, may include the consideration of the number of instances reported, the number of consumers affected and the feasibility of identifying and effectively communicating the warning to those consumers, the economic burden imposed on a manufacturer if the manufacturer must identify and contact current users of the product, the effectiveness of any such warning, the type of product involved and number of units of the product that were manufacturer or sold, and the steps, other than giving notice of the defect, to correct the problem. *Lewis v. Ariens Co.*, 434 Mass. 643, 649, 751 N.E.2d 862 (2001); *Patton*, 253 Kan. at 761-763, 861 P.2d 1299; *Cover*, 61 N.Y.2d at 276-277, 473 N.Y.S.2d 378, 461 N.E.2d 864; *Lovick* at 697. In light of the evidence in this case, or lack thereof, we need not consider those factors here.

[7] The Linerts' counsel relies on Arndt's trial exhibit, which summarizes his database of what he believes to be similar incidents and which the appellate court cited in its opinion. *See* 2014-Ohio-4431, 20 N.E.3d 1047, at ¶ 74. Other than Ross's incident, the exhibit suggests that no more than six incidents involving CVPIs occurred after Ross's CVPI was manufactured. More notably, the exhibit does not describe the nature or circumstances of the incidents.

heard evidence that the factory that produced the fuel tank in the CVPI at issue in this case produced more than 2,000,000 fuel tanks between 1998 and 2005. But the jury did not know how many CVPIs with those tanks were still in use when the other incidents took place. And although the jury was presented with an exhibit that indicated that in 2005 there were 250,000 CVPIs on the road, we are not aware of evidence that informed the jury how many CVPIs were in use at the time of Ross's accident.

{¶ 38} In other words, the Linerts arguably established that there was a risk of fire erupting from sender-unit dislodgements when a CVPI was struck from behind in a high-speed accident, but they did not provide sufficient evidence from which the jury could consider the *likelihood* of the risk. Thus, the trial court properly refused to instruct on a postmarketing duty to warn in this case because the jury would not have had an adequate basis to find that that duty had been breached. *Jablonski v. Ford Motor Co.*, 2011 IL 110096, 955 N.E.2d 1138, ¶ 119. *Accord Flaugher v. Cone Automatic Machine Co.*, 30 Ohio St.3d 60, 67, 507 N.E.2d 331 (1987). At best, the jury would have been left to speculate, or to fling a " 'plank of hypothesis' " over " 'an abyss of uncertainty,' " *Gradus v. Hanson Aviation, Inc.*, 158 Cal.App.3d 1038, 1056, 205 Cal.Rptr. 211 (1984), quoting Edith Wharton, *The Descent of Man*, Scribner's (Mar.1904), 321, to conclude that the risk was sufficient to give rise to any duty on Ford to provide a postmarket warning to consumers. "But speculative risk does not equal known risk." *Mitchell v. Warren*, 803 F.3d 223, 230 (6th Cir.2015).

## CONCLUSION

{¶ 39} We reverse the judgment of the court of appeals, and we remand this cause to the trial court to reinstate its judgment in favor of appellant, Ford Motor Company.

Judgment reversed

and cause remanded.

O'DONNELL, LANZINGER, KENNEDY, and FRENCH, JJ., concur.

PFEIFER, J., dissents and would affirm the judgment of the court of appeals.

O'NEILL, J., dissents, with an opinion.

_____

**O'NEILL, J., dissenting.**

{¶ 40} Respectfully, I dissent.

{¶ 41} The law resolving this case is clear, and I would dismiss the matter as having been improvidently accepted. A trial court is "obligated to provide jury instructions that correctly and completely state the law" when those instructions are "warranted by the evidence presented in a case." *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 22. While we afford trial courts "broad discretion to decide how to fashion jury instructions," we still require courts to " 'give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

{¶ 42} These rules of course presume that juries are the fact-finders. That is not the approach taken by the majority. The majority accepts only those facts found in the record that lead to a verdict in favor of the Ford Motor Company.

{¶ 43} The record, which the majority says contains a "paucity of evidence," actually demonstrates that there were 34 similar collisions causing burns or death of vehicle occupants. In six of these collisions, the fuel-sending unit detached as it did in Officer Linert's accident. Those facts, standing alone, trigger the duty to warn after the sale. *After* this police car was sold and delivered, Ford had a plethora of information, but users did not. There was uncontroverted evidence of six nearly identical accidents.

16

**{¶ 44}** Absent any additional evidence of similar accidents, the Supreme Court of Ohio now ratifies the trial court's decision to take this vital weighing process away from the jury. Juries may make inferences from the evidence presented to them. *Hurt v. Charles J, Rogers Transp. Co.*, 164 Ohio St. 329, 130 N.E.2d 820 (1955), paragraph three of the syllabus. In this case, the jury heard that there had been roughly a quarter-million Crown Victoria Police Interceptors ("CVPIs") on the road in the year Ross Linert's CVPI was manufactured. The jury heard that before Linert's injury, 34 similar rear-impact collisions involving similar vehicles had resulted in burn injuries or deaths. The jury heard that these accidents occurred across many model years of the Panther-platform class of vehicles but that the placement and design of the fuel tanks remained the same within this class from 1979 until 2005. The jury heard that in six of these incidents, the fuel-sender unit dislodged, as it did in Linert's accident. The jury also heard that just after delivery and before Linert's accident, Ford spent several months on a project to strengthen the joint attaching the fuel sender to the fuel tank. This attempt to correct a known defect came after hearing about how the fuel system had performed in actual car accidents. This evidence is clearly enough to infer, one way or the other, about the *likelihood* of a risk inherent in the design of the CVPI fuel tank. That evidence triggers the jury's inquiry whether the Ford Motor Company made a reasonable decision not to warn the consumers who had already bought their products. How could we hold otherwise?

**{¶ 45}** Remarkably, the majority also holds without citation to any authority from this court that information presented to the jury about Ford's presale knowledge and conduct regarding design of fire-suppression and fuel-tank-protection systems was not relevant to the plaintiffs' postsale-failure-to-warn claims and can be relevant only to presale claims. I could not disagree with the majority more vehemently about the relevance of this evidence, given the plain language of the statutes creating the two causes of action. Compare R.C.

2307.76(A)(1)(a) with 2307.76(A)(2)(a) (identical language regarding knowledge of a risk in both provisions). But relying on mere logic about what could be relevant to which claim and why, the majority has decided a better meaning for R.C. 2307.76(A)(2)(a)—or at least a meaning better liked. R.C. 2307.76(A)(2) requires knowledge of a risk associated with a product "at a relevant time after it left the control of its manufacturer." I disagree with the majority's view of R.C. 2307.76(A)(2)(a) because agreeing would require me to countenance the judicial fiction that after selling these cars, Ford somehow "un-knew" whatever it knew before the sale.

{¶ 46} What Ford did or did not do regarding the CVPI fuel tank before the sale of Linert's cruiser is important background evidence that would give a jury some context about the Ford Motor Company's developing understanding of the risks regarding its design before the sale, after the vehicle was delivered, and just before the fiery crash that injured Officer Linert. I do not attribute bad faith to Ford. Surely its actions indicate that it was commendably trying, in the interest of customer safety, to solve a known problem. It was entirely logical for the jury to have inferred from the evidence in this matter that Ford knew the risks inherent in its fuel-tank and fuel-sender-connection design before sale. It is entirely possible that the jury believed that the seriousness of harm did not become apparent enough to create a duty to warn until sometime after that sale and before Linert's accident. And that is why the jury should have been instructed on the postmarket duty to warn. In the absence of such an instruction, the jury verdict in this case reflected blind obeisance to the trial court's limited instruction and was rendered predictably in favor of Ford.

{¶ 47} The plaintiffs may not have presented enough evidence to *convince* the jury that Ford had a duty to warn after sale. I take no position on that. But we will never know what a properly charged jury would have done because the plaintiffs' evidence was not sufficient to convince this court to order the trial court

18

to explain the statutorily mandated postmarket duty to warn. Ultimately, citizens decide whether a manufacturer made a reasonable or an unreasonable postmarket decision about how risky a design might be. They weigh that solemn decision in light of the likelihood of harm and the seriousness of that harm as demonstrated by the evidence before them.

{¶ 48} We, as justices of a court of law, should not be fact-finders here. The applicable legal standard is to "give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *White,* 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46. The appellate court clearly applied this standard below: "[A]ppellants presented evidence on their post-marketing failure to warn claim." 2014-Ohio-4431, 20 N.E.3d 1047, ¶ 26. "This was adequate evidence to put appellants' post-marketing failure to warn claim before the jury." *Id*. at ¶ 29. Seeing that the law was properly applied below, and seeing that the majority merely disagrees with the court of appeals regarding the facts that may be found in the record, I would dismiss the case as having been improvidently accepted.

{¶ 49} Respectfully, I dissent.

––––––––––––––

SL Chapman, L.L.C., Robert W. Schmieder II, and Robert J. Evola; and Green Haines Sgambati Co., L.P.A., and Richard A. Abrams, for appellees.

Thompson Hine, L.L.P., Elizabeth B. Wright, and Conor A. McLaughlin; and Squire Patton Boggs, L.L.P., Pierre H. Bergeron, and Larisa M. Vaysman, for appellant.

Tucker Ellis, L.L.P., John P. Palumbo, and Benjamin C. Sasse, urging reversal for amicus curiae Product Liability Advisory Council, Inc.

Jones Day, Yvette McGee Brown, Chad A. Readler, and Kenneth M. Grose, urging reversal for amici curiae Chamber of Commerce of the United States of America, National Association of Manufacturers, National Federation of

Independent Small Business Legal Center, Ohio Chamber of Commerce, and Ohio Manufacturers' Association.

Rourke & Blumenthal, L.L.P., Johnathan R. Stoudt, and Robert P. Miller, urging affirmance for amicus curiae Ohio Association for Justice.

————————————